(Nos. 47560, 47561 cons.—

THE 2416 CORPORATION, Appellee, v. THE FIRST NATIONAL BANK OF CHICAGO, Trustee, Appellee.—(Chicago Transit Authority *et al.,* Appellants.)

*Opinion filed October 1, 1976.*

Foran, Wiss and Schultz, of Chicago (Robert E. Wiss and John M. Cregor, Jr., of counsel), for appellant Chicago Transit Authority.

Ralph F. Huck, Richard A. Makarski, and Richard G. Smolev, of Chicago (Chapman and Cutler, of counsel), for appellant Harris Trust and Savings Bank.

DeWolfe, DeWolfe and Markley (John C. DeWolfe, Jr., and George F. DeWolfe, of counsel), for appellee 2416 Corporation.

Jack S. Levin and Tefft W. Smith, of Chicago (Kirkland & Ellis, of counsel), for appellee First National Bank of Chicago.

Leonard M. Ring, of Chicago, for appellee Lois Beck.

MR. CHIEF JUSTICE WARD delivered the opinion of the court:

This appeal involves the construction of the trust agreement under which revenue bonds were issued to finance the establishment and initial operations of the Chicago Transit Authority (hereafter CTA), which operates the public transportation system in the city of Chicago and in certain areas beyond the limits of Chicago. The proceeding is directly related to operating deficits of the CTA. These deficits have resulted in adequate funds not being available for deposit in the revenue bond interest and bond retirement accounts of the CTA which were provided for in the trust agreement. (As will be seen, the statute creating the CTA authorized the execution of a trust agreement to secure bondholders.) No default in the payment of interest to bondholders has as yet occurred because of the availability of funds which are not concerned here.

In July 1972 the plaintiffs, Lois Beck and the 2416 Corporation, owners of CTA revenue bonds, filed separate actions in the circuit court of Cook County seeking a construction of the trust agreement with respect to certain moneys held by the CTA. That issue is not involved here, and it is sufficient to note that the court ordered the revenue bond trustee under the trust agreement, the First National Bank of Chicago (hereafter the Trustee), to apply

the moneys for the purchase and retirement of outstanding revenue bonds. In doing so the court declared it was retaining jurisdiction to enable it to consider questions which might arise under its order.

Under that retention of jurisdiction the Trustee, in March of 1974, filed a complaint against the CTA for a declaratory judgment. The Trustee contended that moneys deposited in the Modernization Fund and in the Depreciation Reserve Fund under the trust agreement were available to meet interest obligations on revenue bonds and to make other payments for "debt services," such as purchasing outstanding revenue bonds, when there were not adequate funds in the accounts normally drawn upon for these purposes. The Harris Trust and Savings Bank (Harris) intervened in this action and objected, contending that such a judgment would prejudice CTA equipment trust certificate holders, for whom Harris is the trustee. (New equipment for the CTA is financed through equipment trust certificates which, *inter alia,* provide that title in the equipment remains in the certificate holders until the equipment has been fully paid for.)

On July 23, 1974, the circuit court entered an order that the Trustee had a right to pay interest and other debt services on revenue bonds only from "revenue or income" as defined by section 701 of the trust agreement. The appellate court reversed, holding that under the trust agreement the Trustee had the right to use moneys in the Modernization Fund, other than the proceeds of gifts, loans or grants, including moneys which were proceeds from recoveries for damages to property and proceeds from the liquidation and conversion or sale of CTA property, whenever other moneys for debt service were not available. The appellate court further held that the Trustee had the right to apply all moneys in the Depreciation Reserve Fund to the payment of interest and other debt service obligations whenever there were deficiencies in the debt service accounts. (26 Ill. App. 3d

468.) We granted the petitions for leave to appeal filed by the CTA and Harris. Ill. Rev. Stat. 1975, ch. 110A, par. 315.

In 1945 the General Assembly enacted the "Metropolitan Transit Authority Act," which created the CTA as a municipal corporation. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 301 *et seq.*) Pursuant to the Act the CTA was vested with the power to own, operate and maintain an urban mass transit system in the metropolitan area of Cook County. Section 12 of the Act granted the CTA authority to borrow money for its establishment through the issuance of interest-bearing revenue bonds. These bonds, the Act provided, were to be payable solely from the revenues or income derived by the CTA from the operation of the transit system, and they were not to be considered an indebtedness or obligation of the State or the CTA "within the purview of any constitutional limitation or provision." (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 312.) Section 12 further provided that a trust agreement could be executed to secure the payment of the bonds from the revenue or income of the system. Ill. Rev. Stat. 1975, ch. 111 2/3, par. 312.

In 1947, 1952 and 1953 the CTA issued a total of $135,000,000 in revenue bonds, of which approximately $38,000,000 are outstanding. The funds realized from the issuance and sale of the bonds have been totally expended. Three trust agreements securing the payment of principal and interest on the three bond series were executed between the CTA and the First National Bank of Chicago, as trustee, on July 1, 1947, July 1, 1952, and October 1, 1953. Although the agreements establish separate interest and retirement accounts for each series, all series are to share pro rata in any distributions made to the accounts. The July 1, 1947, agreement is controlling as to all revenue bonds issued by the CTA, as its terms were incorporated into the two subsequent trust agreements. "Trust agreement" in this opinion refers to the three trust agreements,

and all section references are to the July 1, 1947, agreement.

Article 7 of the trust agreement establishes the procedure for the disbursement of all receipts of the CTA. Section 701 defines "revenue or income" as all funds received by the CTA, with these specific exclusions: gifts, loans and grants; proceeds from recoveries for damages to property; proceeds from the liquidation, conversion or sale of property, and proceeds from subway rentals. It states that proceeds from recoveries for damages to property and proceeds from the conversion or disposition of property of the CTA are to be deposited with the Trustee in the Modernization Fund. The proceeds of gifts or grants are also to be deposited in the Modernization Fund, unless there are conditions or restrictions in them providing otherwise.

Sections 702 and 703 of the trust agreement provide for certain priorities in distributing the "revenue or income" of the CTA. All of the revenue or income, including fare box receipts, is to be initially deposited with the Trustee in the Transit Revenue Fund. From this fund the Trustee is then to apply funds in amounts specified in written orders of the CTA board to the Working Cash Account to cover current operation and maintenance expenses. (Sec. 703(a).) Thereafter, to the extent that there are moneys remaining, the Trustee is to transfer the surplus under priorities set out in the trust agreement into a revenue bond interest fund (sec. 703(b)), a revenue bond maturity fund (sec. 703(c)), a revenue bond sinking fund (sec. 703(d)), a revenue bond reserve fund (sec. 703(e)), the Depreciation Reserve Fund (sec. 703(f)), the Operating Expense Reserve Fund (sec. 703(g)), the Municipal Compensation Fund (sec. 703(h)), and the Modernization Fund (sec. 703(i)). The funds or accounts created under sections 703(b) through 703(e), inclusive, concern the payment of interest on and the retirement of outstanding revenue bonds. These funds are given priority over the remaining

accounts in receiving deposits from the Trustee. Section 705 of the trust agreement provides that, if moneys in the Transit Revenue Fund are not sufficient to make the deposits specified under section 703, paragraphs (b) through (e) inclusive,

"the Trustee shall use any moneys then in the Modernization Fund, other than the proceeds of gifts, loans and grants, to make the deposits specified in said subparagraphs (b) to (e), both inclusive, and in the event sufficient moneys should not then be in the Modernization Fund to make the full amount of such deposits, the Trustee shall use any moneys then in the Municipal Compensation Fund, the Operating Expense Reserve Fund and the Depreciation Reserve Fund in order to make the full amount of such deposits."

Article 8 of the trust agreement provides for the creation and use of the Modernization Fund. The preamble of section 803 of article 8 states:

"Disbursements of the moneys in the Modernization Fund shall be made or authorized by the Trustee at any time and from time to time upon the written order of the Board:"

The subparagraphs of section 803 then state for what purposes these moneys may be used. Section 803(6) provides:

"[I]f and whenever moneys in the Transit Revenue Fund may be insufficient to make the deposits specified in paragraphs (b) to (e), both inclusive, of Section 703 and Section 704 of Article Seven, the Trustee shall use any moneys then in the Modernization Fund, other than the proceeds of gifts, loans and grants, to make up such deficiencies with priority in the order in said Section 703 expressed, [that is, priority in favor of sections 703(b) through 703(e) inclusive]."

The appellate court held that under sections 705 and 803(6) of the trust agreement the Trustee was given authority to use deposits made in the Modernization Fund, except for the proceeds of gifts, loans and grants, to pay interest to revenue bondholders. The CTA and Harris make various contentions in their appeals here. One is that the

drafters of the trust agreement intended that the authority of the Trustee to use the Modernization Fund under section 705 to pay interest on revenue bonds was to be limited to the use of moneys in the fund that were derived from "revenue or income," as defined by section 701, and channeled to the Modernization Fund. The CTA argues also that section 803(6) requires the Trustee to have had a written order from the CTA board before the Trustee may use funds from sources other than "revenue or income" that were deposited in the Modernization Fund. Harris contends that the holding of the appellate court ignored the provisions of article 12 of the trust agreement, which provides for the issuance of equipment trust certificates and for their payment out of the Modernization and Depreciation Reserve Funds. Both appellants contend also that the construction placed on the trust agreement by the appellate court that the Trustee has a right to apply proceeds from the sale of CTA property or from recoveries of damages to pay interest on revenue bonds would violate the creation of indebtedness provisions of article 9, section 12, of the 1870 Constitution (Ill. Const. 1870, art. IX, sec. 12), a result which the drafters of the trust agreement could not have intended.

Before we consider these claims of error, it is appropriate to observe that a court's first concern in the construction of a trust is to ascertain the intent of its creators and give effect to the intent, if it does not conflict with the law or public policy of the State. (*United States Trust Co. v. Jones*, 414 Ill. 265, 270.) "In construing a [trust] the intention is to be gathered from the whole instrument. If the intention may be gathered from its language without reference to rules of construction, there is no occasion to use the latter. Where the use of rules as to a presumed intention so twist and warp the evident meaning of a [trust] as to render it ambiguous or unreasonable, and when, on the other hand, the words used in their ordinary sense are plain and their meaning

clear, construction demands the use of the plain intention over the presumed intention, which is fixed by rules used only where the actual intent cannot be ascertained." *Storkan v. Ziska,* 406 Ill. 259, 263-64.

The CTA, to support its argument that the drafters of the trust agreement intended the Trustee's authority to pay interest on revenue bonds to extend only to moneys in the fund coming from "revenue or income" as defined by section 701, cites sections 703(i) and 910 of the trust agreement. Section 703(i) provides:

> "In order to give effect to the provisions of Section 702 hereof, the Trustee shall, from the funds received by it and set aside in or allocated to the Transit Revenue Fund, and in the following order of precedence
>
> * * *
>
> (i) Deposit *in trust* at least semi-annually, with such depositary as the Board may from time to time designate, funds not set aside in accordance with any of the paragraphs (a) to (h) above, in a separate fund designated as 'Modernization Fund' created by Section 802 hereof." (Emphasis added.)

The CTA says that this is the only type of deposit in the Modernization Fund which is to be made "in trust," and it contends that this shows an intention that this type of deposit is to be treated differently, and the deposit segregated, from other moneys in the fund. The CTA concludes that this type of deposit from "revenue or income" in the Transit Revenue Fund is the only type the Trustee can reach in the Modernization Fund to pay interest on revenue bonds.

The argument is not persuasive. By their plain language, section 705 and section 803(6) give the Trustee authority to use moneys in the Modernization Fund, except "the proceeds of gifts, loans and grants," to make deposits in the debt service accounts, *i.e.,* the deposits specified in paragraphs (b) to (e) of section 703, when resort must be had to moneys from the Modernization Fund. Too, both sections specifically exempt "the pro-

ceeds of gifts, loans and grants" in the fund from use by the Trustee. This specific exemption of gifts, loans and grants would have been unnecessary if, as the CTA contends, the Trustee's authority was limited to funds deposited "in trust" under section 703(i).

Nor does section 910 support the CTA's interpretation of section 703(i). Section 910 provides in part:

"The Authority covenants that from time to time, not less often than annually, and except as provided in Section 703(i) of Article Seven hereof, the Board will cause to be transferred to the Transit Revenue Fund any moneys held in separate accounts or funds other than in the Modernization Funds which, in the opinion of the Board, are not required to be retained therein for the purposes of such accounts ***."

The CTA argues that this section, by excepting moneys in the Modernization Fund from transfer and by excepting the operation of section 703(i), shows an intent that section 703(i) moneys were intended to be segregated and kept separate from other moneys in the Modernization Fund, and that these moneys were the only moneys in the fund the Trustee could reach to provide deposits in the debt service accounts.

We believe, however, that the only reason for the specific reference in section 910 to section 703(i) was to make it clear that, before the transfer of funds takes place, excess moneys in the Transit Revenue Fund must first be transferred to the Modernization Fund, as required by section 703(i), "at least semi-annually." Simply stated, the excess moneys in the Transit Revenue Fund are not transferred back to the Transit Revenue Fund pursuant to the general provisions of section 910, but rather are transferred to the Modernization Fund pursuant to section 703(i). Simply put, the function of section 910 is to prevent a clogging of accounts; it is to prevent funds from lying in accounts and not being put to use. Section 910 provides that accounts will be reviewed annually and moneys not required to be retained in them shall be

transferred to the Transit Revenue Fund. The Modernization Fund is excepted from this review because, under section 703(i), Transit Revenue Funds not disbursed under section 703(a) to (h) have already been deposited in the Modernization Fund pursuant to the required semi-annual review. Section 910 simply provides for another review of accounts to prevent the stagnation of funds through nonuse.

The CTA argues next that the preamble of section 803, which we have set out earlier in this opinion, should be construed so as to require a written order of the CTA board before the Trustee can use moneys in the Modernization Fund. The CTA bases this contention on the appearance of the conjunction "and" in the preamble: "Disbursements *** shall be made *** by the Trustee at anytime *and* from time to time upon the written order of the Board." (Emphasis supplied.)

The argument does not convince. The statement is that disbursements shall be made by the Trustee *at any time* and *from time to time* upon written order of the Board. Obviously, the conjunction simply does not have the purpose the CTA would give it. Too, the body of section 803(6) plainly gives authority to the Trustee to act alone. In addition, the futility of the argument is even more clear when section 803(6) is read together with section 705. Section 705 grants the Trustee the right to invade the Modernization Fund without written orders from the Board, and section 803(6) in very similar language confers the same right on the Trustee. Surely it could not have been intended that the Trustee would have an unconditional right to use the fund under section 705 but only a conditional one under section 803(6) that would require the written order of the Board.

We next consider the question whether the rights of the equipment trust certificate holders, said by Harris to be secured by article 12 of the trust agreement, limit the

Trustee's right to use moneys in the Modernization Fund and the Depreciation Reserve Fund. Harris contends that article 12 grants the equipment trust certificate holders a co-equal priority with the Trustee to use moneys in these accounts, and therefore, Harris reasons, the CTA board must be vested with the discretion to apply those funds as it deems proper. Harris cites that part of article 12 which provides: "The payment of equipment trust certificates or notes *** shall only be made from the Modernization Fund, the Special Modernization Fund, or the Depreciation Reserve Fund."

The argument is unconvincing, especially when article 12 is read with articles 7 and 8 of the trust agreement. As we have seen, section 705 and section 803(6) give the Trustee the right to use moneys in the Modernization and Depreciation Funds whenever other moneys are not available for debt service. The Trustee has an unrestricted right to the use of these moneys when the contingency of other funds not being available for debt service occurs. No comparable right is given the equipment trust certificate trustee under article 12. The concerned language in article 12 simply restricts the equipment trust certificate holder's rights to receive payment from only the Modernization, the Special Modernization and the Depreciation Reserve Funds. The equipment trust certificate holders are given their security through the provision in article 12 that title to the buses or other equipment shall remain in the holders until they have been paid.

The last argument of the CTA and Harris to be considered is that if the Trustee is allowed to use moneys in the Modernization Fund which come from recoveries for damage, loss or casualty to CTA property, and to use proceeds from the sale or liquidation of CTA property for the purpose of paying interest on revenue bonds, it will create an indebtedness of the CTA or cause a lien to be placed on its property in violation of section 12 of the

Metropolitan Transit Authority Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 312) and article IX, section 12, of the Constitution of 1870.

The above constitutional provision requires that the designated governmental units, including municipal corporations, upon exceeding a defined indebtedness, provide a direct annual tax to pay the interest on such debt when it falls due and to insure payment of the principal within 20 years. The CTA is a municipal corporation but specifically was given no power to levy taxes for any purpose. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 318.) Thus, apparently the argument is that the CTA's incurring any indebtedness would, in the constitutional sense, violate this constitutional provision, as it has no power whatever to levy taxes.

Section 12 of the Metropolitan Transit Authority Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 312) provides that all bonds issued shall be payable solely from the revenues or income to be derived from the transportation system and that any bonds issued by the Authority shall not become an indebtedness or obligation of the Authority within the purview of the constitutional provision above. The statute further requires that each bond state on its face that it does not constitute an indebtedness or obligation of the CTA but is to be payable solely from the revenue or income derived from the transportation system.

The CTA and Harris contend: Section 701 of the trust agreement in its definition of "revenue or income" excludes the proceeds of sales or liquidation of CTA property and recoveries for damages to CTA property. Specifically excluded also from revenue or income under the definition are gifts, loans and grants to the CTA. Section 701 also provides that these proceeds from recoveries for damages, proceeds from sales and proceeds from gifts and grants are to be deposited by the Trustee in the Modernization Fund. Proceeds from recoveries for damage, loss or casualty and proceeds from the sale or liquidation of CTA property are thus not

revenue or income and cannot, they say, after being deposited in the Modernization Fund, be applied to revenue bonds, as the statute requires that bonds shall be payable solely from revenue or income. Thus a holding by us (the appellate court opinion did not consider the question) that these moneys can be so applied violates the statute, and as there is no direct annual tax to pay the interest, results also in a violation of the constitutional provision.

The definition of "revenue or income" under section 701 does create an ambiguity when one compares the definition with other sections of the trust agreement, but the difficulty posed is not a grave one. As we have observed, the first concern of a court in interpreting a trust is to ascertain the intent of the creators of the trust. In interpreting an instrument one must look to the instrument as a whole and consider all its provisions. *Storkan v. Ziska,* 406 Ill. 259, 263; *Bear v. Millikin Trust Co.,* 336 Ill. 366, 380.

Notwithstanding the definition of "revenue ·or income" in section 701, sections 705 and 803(6), as we have shown, make it indisputably clear that the Trustee can use moneys in the Modernization Fund to pay revenue bond interest and other debt services, with this one exception: the Trustee cannot use the proceeds of gifts, loans and grants under either section 705 or section 803(6). It is clear that gifts, loans and grants to the CTA, by their very nature, come from sources outside the transportation ·system. They cannot be considered to be "revenue or income" because they are not "derived from the transportation system," as required by section 12 of the Metropolitan Transit Authority Act. It is clear from sections 705 and 803(6) that the draftsmen of the trust agreement, notwithstanding the definitional language in section 701, did intend that the proceeds from damage to property and proceeds from the sale of CTA property be considered to be revenue or income. The draftsmen prepared the trust

agreement pursuant to the statute, and the statute specifically provided that the bonds could be only payable from the revenue or income of the transportation system. Certainly it is reasonable to say that the draftsmen intended to comply with the statutory direction to them that the bonds of the CTA not be an indebtedness of the CTA within the purview of the Constitution of 1870. It would be unreasonable to assume that the draftsmen intended to act in violation of the statute, and it is reasonable to conclude that they intended the proceeds from recoveries for damage to property and proceeds from the sale of CTA property to be regarded as revenue or income. They demonstrated their awareness of the requirement that only revenue or income could be used to pay interest on the bonds by stating in sections 705 and 803(6) that the proceeds of gifts, loans or grants could not be used for this purpose. Significantly, they did not exclude the use of proceeds from recoveries for damage to property and proceeds from the sale of CTA property.

Further evidence that the Trustee could use moneys in the Modernization Fund, excepting, of course, proceeds of gifts, loans or grants, to pay interest on revenue bonds and otherwise to apply moneys on the bond indebtedness appears in section 37 of the Act. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 337.) The section expressly provides that moneys in the Modernization Fund can be used to purchase and cancel revenue bonds prior to maturity and also to redeem and cancel bonds whenever the Depreciation Fund is insufficient. Ill. Rev. Stat. 1975, ch. 111 2/3, par. 337.

We regard it as clear that it was intended under the trust agreement that proceeds of recoveries for damage to CTA property and proceeds of sales of CTA property deposited in the Modernization Fund could be used by the Trustee to pay interest on revenue bonds if there were not sufficient moneys in the fund regularly used for that purpose. Further, it was intended that such proceeds were

to be considered as revenue or income so as to meet the statutory requirement that bonds be paid solely from revenue or income derived from the transportation system.

As a corollary of this, obviously there cannot be any question under section 12 of article IX of the Constitution of 1870. When the Metropolitan Transit Authority Act was first challenged this court considered a contention that the Act was invalid in that it permitted the creation of an indebtedness within the meaning of this constitutional provision. In rejecting the contention this court said:

"To constitute a debt against a municipality there must be an obligation which the municipality must, if need be, meet with its funds or property. But if the obligation is to be paid solely from the income derived from the property purchased with the bonds or their proceeds, no indebtedness is incurred. (*Hairgrove v. City of Jacksonville,* 366 Ill. 163; *City of Edwardsville v. Jenkins,* 376 Ill. 327.) This contention cannot be sustained." *People v. Chicago Transit Authority,* 392 Ill. 77, 93-94.

Here no indebtedness is to be incurred within the meaning of the provision, for the bonds are to be paid with revenue or income from the transportation system. See also *People ex rel. Gutknecht v. City of Chicago,* 414 Ill. 600; *Loomis v. Keehn,* 400 Ill. 337, 340-42.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*