THE 2416 CORPORATION *et al.*, Plaintiffs-Appellees, *v.* THE FIRST
NATIONAL BANK OF CHICAGO, Trustee, Defendant and Counterdefendant-
Appellee.—(CHICAGO TRANSIT AUTHORITY, Defendant and
Counterplaintiff-Appellant.)

First District (5th Division)    No. 79-259

Opinion filed December 12, 1980.

Edward J. Egan and Foran, Wiss & Schultz, both of Chicago (Robert E. Wiss and Jeff D. Harrison, of counsel), for appellant.

DeWolfe, Mills & Markley, of Chicago (John C. DeWolfe, Jr., and George F. DeWolfe, of counsel), for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

This is an appeal from an order construing certain provisions of a trust agreement. Plaintiffs 2416 Corporation and Lois Beck, as revenue bondholders of the Chicago Transit Authority (CTA), brought a petition for supplemental relief asserting that CTA has failed to deposit certain moneys into the modernization fund called for under their interpretation of the trust agreement, and seeking an accounting. The First National Bank of Chicago as trustee (Trustee) responded to the petition, claiming that it is uncertain as to the meaning of the trust agreement and requesting instructions from the court. Defendant CTA filed its response to the petition for supplemental relief and its motion for summary judgment. After considering the motions, pleadings, affidavits and arguments, the trial court entered an order denying defendant CTA's motion for summary judgment and further ordering a construction of the trust agreement from which the CTA appeals under Supreme Court Rule 304(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 304(a)). On appeal, defendant CTA contends that the court misconstrued provisions of the trust agreement in entering its order. We affirm in part and reverse in part.

The controversy involves paragraphs 1, 2 and 3 of the order, entered November 15, 1978, which state:

"1. The Chicago Transit Authority shall hereafter deposit in the Modernization Fund, created by the Trust Agreement between the Chicago Transit Authority and The First National Bank of Chicago, as Trustee, dated July 1, 1947, the moneys received by the Chicago Transit Authority from or on account of any damage, loss or casualty to property of the Chicago Transit Authority in excess of the outside incurred costs and expenses of making satisfactory

restoration or replacement of the specific property damaged, lost or subject to casualty, all moneys received by the Chicago Transit Authority from or on account of the damage, loss or casualty to that property shall be deposited by the Chicago Transit Authority in the Modernization Fund.

2. The Chicago Transit Authority shall hereafter deposit in the Modernization Fund moneys received by the Chicago Transit Authority from or on account of the liquidation, conversion or disposition of any Chicago Transit Authority real or personal property or assets: (a) after deducting the outside incurred reasonable and customary expenses of liquidation, conversion or disposition such as title or appraisal expenses as to real property, including outside incurred reasonable and customary removal costs but excluding outside attorneys fees, and (b) in excess of the costs of replacing the specific property liquidated, converted or disposed of. Replacement shall not include new and different property which would substitute for the same function, purpose or utility afforded by the old property being retired. Should the Chicago Transit Authority Board or its delegates determine not to replace the property or other assets liquidated, converted or disposed of, all the net proceeds shall be deposited by the Chicago Transit Authority into the Modernization Fund.

3. The Chicago Transit Authority shall make an accounting to the Court and 2416 Corporation, Lois Beck and The First National Bank of Chicago of the Chicago Transit Authority's disposition of moneys received by it from or on account of the liquidation, conversion or disposition of any Chicago Transit Authority property or assets or any damages, loss or casualty to Chicago Transit Authority property since 1972 until the date of this Order. Since February 1, 1973, the Chicago Transit Authority has been obligated to deposit to the Modernization Fund moneys from those sources in the amounts determined in accordance with paragraphs one (1) and two (2) above. The Chicago Transit Authority shall have until May 15, 1979 to complete the accounting. Thereafter, to the extent deemed necessary by the parties and allowed by the court, the 2416 Corporation, Lois Beck and The First National Bank of Chicago shall have discovery into the accounting submitted by the Chicago Transit Authority."

The trust agreement has been construed in another case involving the same parties as are involved in the present suit. (*2416 Corp. v. Chicago Transit Authority* (1976), 26 Ill. App. 3d 468, 325 N.E.2d 692, *aff'd* (1976), 64 Ill. 2d 364, 356 N.E.2d 20.) The supreme court there held that the First National Bank, as Trustee, has first priority to and a vested claim on

behalf of the revenue bondholders against all moneys properly depositable by CTA, under the terms of the trust agreement, in the modernization fund and depreciation reserve fund, other than the proceeds of gifts, loans and grants, if and whenever moneys in CTA's transit revenue fund are insufficient to provide for the various debt service payments required by the trust agreement. Nevertheless, that case did not address the question of what moneys belong in the modernization fund. That question is the issue raised in this appeal. After the supreme court rendered its decision in the *2416 Corp. v. Chicago Transit Authority* case, the litigation was reinstated in the trial court and CTA was directed to turn over to the Trustee money from the modernization fund and the depreciation reserve fund to be used for debt service.

During 1947, 1952 and 1963 CTA issued a total of $135,000,000 in revenue bonds, of which $38,606,000 are outstanding. The funds obtained by the sale of the bonds have been totally expended. Three trust agreements, executed July 1, 1947, July 1, 1952, and October 1, 1953, between CTA and the Trustee, secured the payment of principal and interest on the three bond series. Although the agreements established separate interest and retirement accounts, all series are to share pro-rata in any distributions made to the accounts. The July 1, 1947, agreement is controlling as its terms are incorporated by reference into the two subsequent agreements. "Trust agreement" in this opinion refers to all three trust agreements and all section references are to the July 1, 1947, agreement. In the original trust agreement, a system of accounts was set up through which all of CTA's revenues and income pass. Article 7 of the trust sets forth the procedure for the disbursement of all receipts of the CTA. Section 701 states in pertinent part:

"The revenue or income of the Authority [which must be deposited in the Transit Revenue Fund and then used for the payments set forth in paragraphs (2) through (7) herein] shall mean and include any and all funds received by the Authority from any source whatever, *except moneys received* by the Authority from or on account of

(a) the liquidation, conversion or disposition of any property or assets;

(b) any damage, loss or casualty to property;

❋ ❋ ❋

Moneys received by the Authority from sources specified in the foregoing clauses (a) and (b) shall be paid by it to the Trustee and be by it deposited in the Modernization Fund ❋ ❋ ❋." (Emphasis added.)

Sections 702 and 703 of the trust agreement provide for certain priorities as to the expenditure of the funds of CTA. All of CTA's income

or revenue, including fare box receipts, is to be deposited by the Trustee into the transit revenue fund. From the transit revenue fund the Trustee is to transfer amounts specified by written orders of the CTA Board into CTA's working cash account to cover current operation and maintenance expenses.[1] Then, to the extent there are moneys available, the Trustee is to transfer surplus money from the transit revenue fund into a revenue bond interest fund,[2] a revenue bond maturity fund,[3] a revenue bond sinking fund,[4] a revenue bond reserve fund,[5] the depreciation reserve fund,[6] the operating expense reserve fund,[7] the municipal compensation fund,[8] and the modernization fund.[9] The funds established under sections 703(b) through 703(e), inclusive, relate to the payment of interest on and the retirement of outstanding revenue bonds. These funds have priority over the remaining funds in receiving deposits from the Trustee. As indicated, the supreme court opined in the *2416 Corp. v. Chicago Transit Authority* case, that section 705 and 803(6)[10] of the trust agreement directs the Trustee to use any money in the modernization fund, except for the proceeds of gifts, loans and grants, for the payment of debt service on the revenue bonds in the event the CTA fails to provide other money for that purpose.[11]

---

[1] Sec. 703(a)
[2] Sec. 703(b)
[3] Sec. 703(c)
[4] Sec. 703(d)
[5] Sec. 703(e)
[6] Sec. 703(f)
[7] Sec. 703(g)
[8] Sec. 703(h)
[9] Sec. 703(i)
[10] Article 8, section 803, preamble states: "Disbursement of the moneys in the Modernization Fund shall be made or authorized by the Trustee at any time and from time to time upon the written order of the Board."
Article 8, section 803(6) provides: "[I]f and whenever monies in the Transit Revenue Fund may be insufficient to make the deposits specified in paragraphs (b) and (e), both inclusive of sections 703 and 704 of Article 7, the Trustee shall use any moneys then in the Modernization Fund, other than the proceeds of gifts, loans and grants, to make up such deficiencies with priority in the order in said section 703 expressed."
[11] At the time of the prior litigation concerning the respective rights of the CTA and the Trustee to the moneys in the modernization fund, there was approximately $2.1 million deposited to the modernization fund. By order of this court, approximately $1.7 million then remaining in the modernization fund was deposited into the respective Revenue Bond Reserve Funds. That money all constituted proceeds of the sale of CTA real property. By virtue of stipulation of the parties to the prior appeal, $305,411 of the modernization fund money was used to make the January 1, 1975, interest payment on the series of 1952 and 1953 revenue bonds. Further, money from the modernization fund was used to make the entire July 1, 1975, interest payment of $405,122 on the Series 1952 and 1953 revenue bonds. To the extent money in the modernization fund is not needed to provide for debt service or revenue bonds, it can be used for capital expenditures on order of the CTA board. At present, there is no money in the modernization fund. However, CTA's capital expenditure needs have been provided for out of Federal, State and local gifts and grants.

Article 10 of the trust agreement provides for the damage, loss or casualty to property, as follows:

> "The Authority covenants to obtain from responsible insurance companies and to maintain insurance to the reasonable insurable value of the properties of the transportation system against loss by fires, wind, storms, explosions, burglary, theft and other damage and losses to the extent that property of similar character is usually insured by utility enterprises similarly situated and operating like properties and that full and complete schedules of all such policies of insurance and of the renewal certificates and policies as soon as and whenever such insurance is effected will be filed with the Trustee; *provided, the Authority may elect partially or wholly to provide such insurance by means of an insurance fund or otherwise* * * *. All insurance premiums and all insurance fund moneys in connection with the foregoing shall be paid by the Board from the Working Cash Account as an operating expense.
> * * *
> *All insurance moneys and such additional moneys as may be necessary to defray the cost of the restoration or replacement of properties damaged or destroyed shall be paid out on the written order of the Board, but if the Board determines that such property is not to be restored or replaced, or if there be any balance of insurance moneys remaining after making satisfactory restoration or replacement then such moneys or such balance thereof, as the case may be, shall be placed in the Modernization Fund."* (Emphasis added.)

Moreover, article 11 of the trust agreement, section 1102, states in relevant part:

> "The Authority, subject to the conditions and limitations in this Trust Agreement prescribed and in the manner provided and to the extent permitted by law, *may sell or otherwise dispose of property owned by it whenever the Board shall have determined that such property is not necessary, appropriate, profitable to, or for the best interests of the Authority and the transportation system, or that it is not adapted to the proper operation and maintenance thereof* ... The *proceeds* of such sale or disposal shall be *deposited* with the Trustee and shall be by the Trustee placed in the *Modernization Fund*." (Emphasis added.)

Defendant CTA concedes that sections 701 and 1102 of the trust agreement provide for the CTA to deposit the "proceeds" of the "liquidation, conversion or disposition of any property or assets" and "moneys" received for "any damage, loss or casualty to property" into the modernization fund. Further, CTA admits that since February 1, 1973, it

has received moneys from the aforementioned sources, but has not deposited these moneys into the modernization fund because its interpretation of the trust agreement does not require it to do so. However, proceeds received by CTA from the sale of real property were deposited by CTA into the modernization fund and are not in issue in this proceeding, except insofar as the trial court adopted a construction of "net" proceeds with respect to such sales.

OPINION

I.

Before considering defendant CTA's contentions, we must address ourselves to the threshold question of whether we have jurisdiction to consider this appeal. Although neither of the parties initially briefed this question, we requested at oral argument that they submit points and authorities on this matter. Both sides responded to our request, by supplemental briefs, and each expressed the belief that we did have the power to hear this case since the November 15 order was a final and appealable order within the meaning of Supreme Court Rule 304(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 304(a)). They essentially argued that the November 15 order decided the only substantial issue in controversy: what moneys should be deposited in the modernization fund, under the trust agreement; and reserved only ministerial or incidental matters such as an accounting as to the moneys CTA received by virtue of liquidation, conversion or disposition of CTA property, or assets or any damage, loss or casualty to CTA property from its period of 1972 to November 15, 1978. We agree with their conclusion.

Rule 304(a) provides in pertinent part:

"If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying enforcement or appeal."

In the present case, the petitions filed by plaintiffs requested that the court declare: (1) that certain moneys received by CTA from the liquidation, conversion or disposition of CTA property or from damage, loss or casualty to such property should be paid into the modernization fund and, therefore, be made available for debt service on the revenue bonds; and (2) require CTA to account for its past disposition of moneys received from the foregoing sources for the five years preceding the filing of the petitions for supplemental relief. The November 15 order of the trial court construed the trust agreement to require the deposit of specifically determinable funds in the modernization fund and directed CTA to account to plaintiffs and the Trustee with respect to the moneys it

received from those sources. The court's order further provided that no just reason exists for delaying enforcement or appeal of its order. Thus, if Rule 304(a) is to apply, it must be shown that the order involves a final judgment as to one or more but fewer than all of the parties or claims made in this case and that the trial court made an express written finding that there is no just reason for delaying enforcement or appeal. We think that both requirements have been met.

■■ In the pending case, we find that the November 15 order was a final judgment as to one or more but fewer than all of the claims. An order is final if "it determines the ultimate rights of the parties with respect to distinct matters which have no bearing on other matters left for future consideration or if the matters left for future determination are merely incidental to the ultimate rights which have been adjudicated by decree." (*Barnhart v. Barnhart* (1953), 415 Ill. 303, 309, 114 N.E.2d 378, 381.) To be final, an order must conclude the litigation between the parties on the merits so that only execution remains to be accomplished if affirmed on appeal. (*Savage v. Schoenstadt* (1979), 68 Ill. App. 3d 552, 386 N.E.2d 339; *Coble v. Chicago Health Club, Inc.* (1977), 53 Ill. App. 3d 1019, 369 N.E.2d 188.) The November 15 order construed the trust agreement to require the deposit of specifically determinable funds in the modernization fund and then required CTA to account for its past disposition of moneys received in accordance with the trust agreement. Having construed the trust agreement to require the deposit of specified funds in the modernization fund, the trial court adjudicated the ultimate rights of the parties with respect to what moneys are available for debt service on the revenue bonds and terminated that part of the litigation so that only execution remained to be accomplished if affirmed on appeal. The accounting ordered and yet to be undertaken is a separable issue (*Altschuler v. Altschuler* (1948), 399 Ill. 559, 78 N.E.2d 225), and is "a mere incident which flows from a right established by the decree." *Barnhart v. Barnhart* (1953), 415 Ill. 303, 309, 114 N.E.2d 378, 381.

## II.

The CTA admits that article 11, section 1102, of the trust agreement authorizes a sale of property whenever the board decides that such property is "not necessary for the system or not adapted to proper operation or maintenance of the system" and that money arising from such category arises from a "liquidation, conversion or disposition" of such property pursuant to section 701(a). Further, CTA concedes that a section 701(a) disposition of real estate is a final severance from the transportation system, and thus is correctly deposited in the modernization fund. Nevertheless, the CTA argues: (1) that even though the proceeds of real estate sales are to be deposited in the modernization

fund, the trial court's order allowing deductions from the sale of real estate of only "outside" expenses is contrary to the provisions of the trust agreement; and (2) constitutes an incorrect interpretation of the term "net proceeds." We cannot agree.

The CTA further points out, however, that (1) the revenue bond-holders of the CTA and the Trustee took the position in the trial court that the trust agreement mandated the "gross" proceeds of sales from liquidation of real property assets be deposited in the modernization fund; (2) the proper interpretation of "net proceeds" under the trust agreement is set forth in 66 C.J.S. 8 (1950) and means the sum actually received after making all deductions; (3) no issue was raised or evidence presented in the trial court with reference to "outside" or "inside" expenses or costs; and (4) the order defining "net proceeds" as including only certain "outside" expenses of sale was not based on any allegations or proofs in the case.

The bondholders and the Trustee concede that in the trial court they argued that "gross proceeds," rather than "net proceeds," should be deposited into the modernization fund. They contend, however, that the trial court's order accepted only part of that argument to the extent of excluding "inside incurred expenses." The issue of allowing "inside" or "outside" expenses was, therefore, reached by the trial court by means of the arguments made against the "gross proceeds" theory by CTA.[12]

Before considering these arguments, we observe that the first concern of a court in interpreting a trust agreement is to ascertain the intent of its creators and to give effect to that intent, if it does not conflict with the law or the public policy of the State. *2416 Corp. v. First National Bank* (1976), 64 Ill. 2d 364, 356 N.E.2d 20.

> "In construing a [trust] the intention is to be gathered from the whole instrument. If the intention may be gathered from its language without reference to rules of construction, there is no occasion to use the latter. Where the use of rules as to a presumed intention so twist and warp the evident meaning of a [trust] as to render it ambiguous or unreasonable, and when, on the other hand, the words used in their ordinary sense are plain and their meaning clear, construction demands the use of the plain intention over the presumed intention, which is fixed by rules used only where the actual intent cannot be ascertained." *Storkan v. Ziska* (1950), 406 Ill. 259, 363-64, 94 N.E.2d 185; *Ford v. Newman* (1979), 77 Ill. 2d 335, 396 N.E.2d 539.

■■ We believe that the trial court properly ruled that a deduction was

---

[12] No appeal has been taken by the bondholders or the Trustee from the trial court's rejection of the "gross" proceeds argument.

permitted only for "outside incurred costs and expenses" of liquidation, conversion or disposition of any CTA real or personal property, but that "outside" attorney fees incurred in connection with the sale of property were to be excluded. We also approve of the court's rationale in excluding "inside" costs which appears to be that it would be inappropriate to allow such "interval" costs to be deducted because of the fixed nature of the expenses of restoration, removal or sale. To allow a deduction for such "inside" expenses would, in effect, permit CTA to double charge against its debt service obligations on revenue bonds by charging once as an expense chargeable to the working cash account and charging again in determining whether money must be deposited to the modernization fund. Moreover, we approve the court's reasoning with reference to excluding as a deduction "outside" attorney fees in connection with the sale of property which is that such matters should be handled by CTA's own legal staff.

It has been long established that the term "proceeds" as used in contracts, trusts and other written instruments must be construed in the context in which it is used in the instrument. (*Remsen v. Midway Liquors, Inc.* (1961), 30 Ill. App. 2d 132, 174 N.E.2d 7.) Although there is no definition of either the terms "proceeds" used in section 1102 or "money received" found in section 701 in the trust agreement, there is also nothing in the agreement that indicates that the terms carry different meanings, even though CTA argues that the words have different meanings. We think that the terms carry the same meaning under the agreement. The term "proceeds" usually refers to gross proceeds. However, this does not mean that expenses incidental to the disposition cannot be deducted. For these are expenses that are generally deducted during the transaction. Thus, the "net proceeds" will be the gross amount actually received. We believe that the trust agreement does not preclude a construction of the term "net proceeds" that disallows "inside" expenses. Further, the court's order does not dictate how CTA should operate since it does not direct how CTA should use, restore, replace or remove damaged or sold property but holds that if such work is performed "in-house," CTA cannot both charge it to the working cash account and then deduct it again when considering what moneys must be deposited into the modernization fund. Furthermore, CTA's assertion concerning the absence of any evidence relating to "outside" or "inside" expenses is without merit because the record discloses that evidentiary issues were deferred by the trial court pending the accounting by the CTA in accordance with the court's construction of the trust agreement. The court was only concerned here with construing the trust agreement.

We note that while CTA separately discusses the disposition of real and personal property in its brief, neither the trial court's order nor the

trust agreement makes any distinction between the two types of property. We find it appropriate, however, to discuss the two types of property separately because the only contention raised by CTA regarding the "net proceeds" from the sale of real estate is that the trial court's order permits CTA to deduct only "outside incurred" expenses of "liquidation, conversion or disposition." Hence, CTA conceded that the "proceeds" of the sale of real estate must be deposited into the modernization fund. Indeed the record reveals that over the period in question $2,107,000 of such proceeds, minus a deduction of $12,280 for appraisal fees and title expenses, was deposited in the modernization fund along with $261,000 in interest earnings on those proceeds. However, our reasoning with respect to approving the trial court's elimination of "inside" or "in-house" expenses associated with the disposition of real estate applies also to sales from liquidation of personal property and to the proceeds of damage, casualty or loss which issues will be later discussed.

### III.
#### (a)

The CTA argues that the trial court erred in construing the trust agreement as requiring deposit in the modernization fund of the *net proceeds* of sales from the liquidation of personal property assets when such assets are being *replaced* because a *replacement* is not provided for under section 701(a), nor is it within the concept of a *sale* as used in article 11. We disagree.

The CTA acquiesces, however, in a construction of the trust agreement that requires net proceeds of personal property assets determined by the Authority to be "not necessary for the system or not adapted to the proper operation or maintenance of the system," as provided in section 1102, be deposited in the modernization fund; but it asserts that as to a sale where it is *not* determined that the property is *not* necessary, the deposit or disposition of the proceeds are not governed by sections 701(a) and 1102 and thus are not properly deposited in the modernization fund.[13]

Furthermore, the CTA posits that the trust agreement allows proceeds from sales incident to replacement (which CTA claims is the opposite of a sale of asset or assets which are determined to be not necessary to the system) to be disposed of as it determined under section 701(e), which provides that money received by the CTA from sources other than those specified in section 701, such as damage recoveries or sales of CTA property, and which do not constitute revenue or income

---

[13] In the trial court CTA admitted receipt of at least $2,604,163 from the retirement of personal property since 1973. None of these moneys were deposited in the modernization fund.

under standard accounting practice, may be used for whatever purpose the CTA decides. Additionally, the CTA contends that (1) the trust agreement requires it to deposit proceeds from the sale of property in the modernization fund only when it decides that the property is to be finally severed and eliminated from the transportation system; (2) a sale of property incident to the replacement of property being retired is not a *final* severance in accordance with section 1102; and (3) the intention of the drafters of the trust agreement was to exclude the deposit of *sales incident to replacement* from the modernization fund since they did not include the word "replacement" in section 701(a) which states that moneys received by the Authority from "the liquidation, conversion or disposition of any property or assets" should be so deposited.[14]

■■ This argument is not persuasive because adoption of CTA's position would establish an interpretation that where there is a replacement there could not be a final severance.[15] Initially, we observe that section 1102 is the only provision of the trust agreement which authorizes the sale of any CTA property. Thus, by its plain language it must apply to a sale incident to any property being retired. Otherwise such a sale is unauthorized. Further, a section 1102 determination can be made that a particular asset is not "necessary," "appropriate" or "adopted" regardless of whether that asset is to be replaced. Conversely, an obsolete item that is to be replaced by a new item is probably no longer "profitable," "appropriate," or "adapted" to the proper operation of a transit system. However, undoubtedly the drafters of the trust agreement did not intend to preclude such sales. Moreover, it would appear that insertion of the word "replacement" into section 701(a) would have been inappropriate because that section refers to various sources from which moneys are received by CTA, and "replacement" does not belong in this category since by definition "replacement" refers to an outlay, not a receipt of money.

---

[14] CTA states in its brief that the historic principle: "The inclusion of one, is the exclusion of the other" is applicable.

[15] Section 703(b) of the trust agreement provides for replacement of property without it becoming a "final severance." It dictates that noncasualty replacements are to be paid out of the depreciation reserve fund. The section states in relevant part:

"Set aside, monthly, in a separate fund designated 'Depreciation Reserve Fund' on the written order of the Board, an amount of money _____ adequate to provide for estimated depreciation or obsolescence ° ° ° and the moneys in the Depreciation Reserve Fund may be paid to or on the order of the Board to pay the cost of all such replacements made or to be made including the cost of removals of property ° ° °."

Plaintiff, 2416 Corporation, refers to this section in arguing that the cost of noncasualty replacements come out of depreciation reserve and is not deductible against the item replaced. However, there are no moneys in the depreciation reserve fund, yet both casualty and noncasualty replacements must be made in order to continue operations. Further, the trial court's order did not adopt this position and no cross-appeal was filed in this regard.

Secondly, the language of section 1102 does not provide support for CTA's interpretation that a sale which would give rise to a deposit in the modernization fund is one in which the property is to be finally severed as distinguished from being replaced.

Lastly, despite CTA's assertion in its brief that section 1102 does not encompass "replacement sales" as distinguished from final "liquidation" sales and that this argument is supported by CTA's "continuing obligation to operate and maintain a transportation system," we find the argument unconvincing. We believe that the language of section 1102 is broad enough to encompass a retirement replacement sale.

In addition, evidence discloses that proceeds were received by the CTA from the sale of copper wire from the old CTA trolley car system which was not deposited in the modernization fund. The record does not clearly indicate whether this copper wire was not replaced "incident to the continued operation and maintenance of the system." Nonetheless, the proceeds from this transaction would appear to be properly deposited into the modernization fund but instead ultimately were placed in the depreciation reserve fund. This transaction would appear to be at variance with CTA's theory of exclusion of sales incident to replacement from sections 1102 and 701(a). CTA's later theory contained in its brief that deposit in the modernization fund need not occur because the transaction is controlled under section 701(e) since it is "not properly classified as revenue or income" lacks merit.

### (b)

The CTA argues next that the trial court erred in restricting its right to offset the costs of replacing property sold against the amount of proceeds received to a new item of a same or similar type ("in-kind").[16] We agree. The CTA contends that this right should extend to the cost of a new and different property which could substitute for the same function or purpose as the old asset being retired.

The bondholders and the Trustee maintain in their brief that acceptance of the CTA's argument would allow the CTA to avoid depositing proceeds of even obsolete property by "contriving a theory of functional equivalence" for some capital expenditure it was contemporaneously engaged in to the detriment of the bondholders.

■■ We note the existence of a presumption that public officials act in good faith and with honest motives (*Chicago Motor Coach Co. v. Budd*

---

[16] The trial court apparently accepted the concept that if old buses were traded in for new buses, the trade-in proceeds could be applied to the purchase price of the new buses, which amounts to a property-by-property basis of replacement. However, the court was unwilling to adopt a broad theory of replacement on which the purchase price of new and different property, the functional equivalent of the old property, could be offset against the proceeds of the sold property.

(1952), 346 Ill. App. 385, 105 N.E.2d 140) and point out that there is nothing in the record to the contrary. Moreover, the record discloses that CTA possesses a vast inventory of materials and supplies. To construe the trust agreement as authorizing only a property-by-property analysis of each and every replacement which occurs on a daily basis within the giant transit system would appear to be unreasonable when the complicated tracing and accountability procedures that would be required are considered. We need rely on no construction aids to arrive at this conclusion, but were we to rely on established tenets of construction, this conclusion would be equally compelled. Trusts, contracts or other written instruments are to be given a reasonable construction and not one that would lead to unreasonable or absurd consequences. (*Marshall Field & Co. v. J. B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 226 N.E.2d 454; 12 Ill. L. & Prac. Contracts §219 (1955); 35 Ill. L. & Prac. Trusts §81 (1958).) Thus, we believe that the proper interpretation of the trust agreement is one that gives CTA the right to offset the costs of replacing the property retired against the proceeds received not only with the specific property or asset (in-kind) but also with a replacement which would substitute for the same function, purpose or utility provided by the property or asset retired. Consequently, the trial court erred in construing the trust agreement as precluding replacement of "new and different property which would substitute for the same function, purpose or utility afforded by the old property retired."

## IV

### (a)

The CTA contends that the trial court erred in construing the trust agreement to require that damage, loss or casualty funds are to be deposited in the modernization fund in excess of "outside" costs and expenses incurred in making restoration or replacement of the specific property damaged, lost or subject to casualty. We find this argument unpersuasive.

The record discloses that CTA received $821,508 in damage proceeds during the period involved here. None of this money was deposited in the modernization fund. Further, that during this period the total amount of billing for repair or replacement of property damaged allegedly amounted to $1,940,060. In addition, the proceeds of the amounts recovered as a consequence of damage, loss or casualty were deposited in the working cash account, and the costs of repair or replacement were paid from this account.

Specifically, CTA argues that the category of damage, loss or casualty proceeds is not controlled by sections 701 and 701(b), which provide generally that such proceeds are deposited in the modernization fund;

however, it concedes that where the CTA board, in accordance with article 10 of the trust agreement, determines that the property generating such proceeds "is not to be restored or replaced" or if there is a surplus of such recovery over the cost of repairs and replacement, then such proceeds are to be placed in the modernization fund. CTA urges that the evidence did not establish that the board had made a determination not to restore the property, giving rise to the damage, loss or casualty money. Consequently, this category of proceeds is governed by section 701(e).

However, article 10 provides in pertinent part:

> "All insurance moneys and such additional moneys as may be necessary to defray the cost of the restoration or replacement of properties damaged or destroyed shall be paid out on the written order of the Board, but if the Board determines that such property is not to be restored or replaced, or if there be any balance of insurance moneys remaining after making satisfactory restoration or replacement then such moneys or such balance thereof, as the case may be, shall be placed in the Modernization Fund."

■■ Accordingly, article 10 requires that damage proceeds be deposited in the modernization fund without regard to whether the damaged property is replaced by CTA. If CTA decides not to replace an item of damaged property, article 10 dictates that all damage proceeds must be so deposited. If CTA determines that the property is to be repaired or replaced, it is allowed an offset against the damage funds for "such property" to defray the cost of repairs and replacement with any "such balance" or "such moneys" being placed in the modernization fund.

We observe that there is no evidence in the record concerning any decision by CTA either to *not* replace damaged property or to restore or replace all of its damaged or lost property. This lack of evidence is clearly due to the issues before the trial court which were not evidentiary at this stage of the proceeding but concerned the proper construction of the trust agreement. The evidentiary issues were to be resolved after the judicial construction which determined whether any material evidentiary issues exist.

### (b)

■■ The CTA next asserts that the portion of article 10 that provides that any balance of insurance moneys remaining after making restoration or replacement shall be placed in the modernization fund refers solely to insurance proceeds assumedly derived from a commercial insurer and CTA points out that it does not carry commercial insurance (except for catastrophic loss) and it does not have a self-insurance fund. It is, however, a self-insurer. We find this argument to be without merit. Article 10 authorizes CTA to insure against loss by commercial insurance but

allows it to elect to be a self-insurer.[17] Hence, where article 10 states that any balance of insurance moneys remaining after making restoration or replacement is to be deposited in the modernization fund, it obviously includes proceeds from a commercial insurer or through self-insurance. We do not think that CTA can evade its obligations to the bondholders under article 10 by electing to become a self-insurer.

### (c)

In support of its position that the court erred in requiring moneys received from damage, loss or casualty to be placed in the modernization fund, where *no* determination is made not to restore or replace, CTA maintains that under generally accepted accounting principles, damage proceeds are not properly classified as revenue or income and therefore are governed by section 701(e). As mentioned earlier, 701(e) provides that moneys received by CTA from sources other than those specified in 701, such as damage recoveries or sales of CTA property, and which are not classified as revenue or income, under standard accounting practice, may be used for whatever purpose CTA decides.

We have observed before that in interpreting a trust the court's first concern is to ascertain the intent of the creators of the trust. One must look to the instrument as a whole and consider all its provisions, and sections dealing with the subject matter in detail take precedence over sections which contain general provisions on the same subject. *Storkan v. Ziska* (1950), 406 Ill. 259, 94 N.E.2d 185; *Bear v. Millikin Trust Co.* (1929), 336 Ill. 366, 168 N.E. 349.

Section 907 of the trust agreement provides that records and accounts of the transportation system are to be kept in accordance with standard accounting principles, "with such modifications as may be necessary or appropriate to meet the accounting requirements of this Trust Agreement."

■■ Irrespective of "standard accounting practices," section 701(b) and article 10 provide that certain damage proceeds are to be deposited in the modernization fund. Section 907 provides for "modifications," thus this section being specific is controlling on the subject of "standard accounting principles," and 701(e) is subjugated to it.

### (d)

CTA also urges that the portion of the order limiting "net proceeds" to "outside" incurred expenses and costs with reference to the proceeds of damage, casualty or loss is improper because no evidence was presented concerning this aspect of expenses or costs. As earlier mentioned, the

---

[17] The pertinent portion states: "° ° ° the Authority may elect partially or wholly to provide such insurance by means of an insurance fund or otherwise ° ° °."

evidentiary issue was deferred by the trial court pending the accounting. We think, however, that the same reasons given for our approval of the trial court's construction of the trust agreement restricting deductible expenses to "outside" expenses with respect to real and personal property are applicable here.

## (e)

■■ The trial court's order, among other things, held that proceeds of damage, loss or casualty could be applied to the cost of restoration or replacement of the *specific* property. To the extent that this order imposes a condition of replacement "in-kind" as previously discussed with respect to personal property, we find it improper based on the same considerations heretofore discussed. The proper condition of replacement should be a "functional equivalent" theory which has heretofore been mentioned. Moreover, that portion of the order which provides that the excess over the cost of restoration or replacement be deposited in the modernization fund appears to impose a property-by-property analysis of every restoration or replacement transaction in which CTA engages. We believe that the court erred in imposing such a condition. If, as CTA urges, its "billings for repair or replacement of property damaged during the period involved exceeded the amounts recovered by CTA as a consequence of damage, loss or casualty" this should be considered in a "balance of the fund" approach where at a specified time the net proceeds would be totaled against cost for repair or replacement.

## (f)

■■ Alternately, CTA posits that it has handled the moneys recovered for damage to its property for 30 years in accordance with the existing procedures and these practices have been evidenced in reports and statements that are public records and in consequence a construction of the trust agreement has been established based upon acts or conduct adopted by the parties. Again, we cannot accept this argument. In rejection of CTA's position, we find persuasive the following: (1) It was not until CTA stopped making deposits to interest and sinking funds in February of 1973 that inquiry into CTA's handling of funds became necessary; (2) section 1404 of the trust agreement precludes a waiver of rights by the Trustee or the bondholders and allows them to exercise every power and remedy as often as deemed expedient by the Trustee;[18]

---

[18] Section 1404 provides: "No delay or omission of the Trustee or of any holder of revenue bonds secured by this Trust Agreement to exercise any right or power shall impair any such right or power or shall be construed to be a waiver of any such right or power and every power and remedy given by this Article Fourteen to the Trustee may be exercised from time to time and as often as may be deemed expedient by the Trustee."

and (3) the interpretation advanced by CTA is based solely on its own conduct and the Trustee never became a party to such construction as excluding any responsibility of CTA to deposit damage proceeds into the modernization fund.

## V.

CTA finally contends that the order requiring it to account for its disposition of moneys received for damaged or sold property is erroneous and unnecessary. We find this contention untenable and believe that plaintiffs and the Trustee are entitled to an accounting.

It is a matter largely within the discretion of the court as to whether an accounting will be ordered (*Holsz v. Stephen* (1936), 362 Ill. 527, 200 N.E. 601; *Dailey v. Sunset Hills Trust Estate.* (1975), 30 Ill. App. 3d 121, 332 N.E.2d 158), and even though the burden may be considerable where the duty to account is present, the requirement must be met. *Polikoff v. Levy* (1971), 132 Ill. App. 2d 492, 270 N.E.2d 540.

■■ In the present case, an accounting is necessary since we have held, contrary to CTA's interpretation, that the trial court properly found that damage and sale proceeds are governed by section 701(a) and (b) requiring the deposit of certain net proceeds into the modernization fund. Further, a consideration of the liquidation or conversion of property may necessitate examination of other accounts besides the modernization fund and depreciation reserve fund. However, since section 907 requires CTA to keep accurate records, the accounting should not prove unduly burdensome even though it is apparent that the account must cover many years, will consist of many items and may require production of many documents.

We conclude, therefore, that the holdings of the trial court in paragraphs 1 and 2 of its order construing the trust agreement insofar as it requires a "property-by-property" analysis as to replacement and damage proceeds and an "in-kind" condition as to sale proceeds are reversed, and we remand this cause with directions that paragraphs 1 and 2 of the order be amended consistent with the content of this opinion and for further proceedings in accordance with the views herein expressed.

Affirmed in part, reversed in part and remanded with directions.

SULLIVAN, P. J., and LORENZ, J., concur.