CSFM CORPORATION, formerly known as Chicago Steel Corporation, a Wisconsin corporation, and FM Properties of Wisconsin, Inc., Plaintiffs,

v.

ELBERT & McKEE COMPANY, a partnership, William W. McKee, Jr., Phillip O. Elbert, Raymond Jasica, Chicago Steel Corporation, an Illinois corporation, Defendants.

No. 87 C 8495.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 2, 1994.

---

John J. Voortman, Alana L. Helverson, Edward J. Finn, Schiff, Hardin & Waite, Chicago, IL, for plaintiffs.

Stephen Novack, Donald A. Tarkington, Novack & Macey, Chicago, IL, for defendants.

LINDBERG, District Judge.

Having reviewed *de novo* the objected to portions of Magistrate Judge Pallmeyer's report and recommendation, the court overrules the objections and accepts the report and recommendation. Defendants' motion for summary judgment on count two is denied. Plaintiffs' motion for summary judgment on count two is granted in the amount of $823,461.38.

## REPORT AND RECOMMENDATION: COUNT II

PALLMEYER, United States Magistrate Judge.

This case arises from Defendants' 1986 purchase from Plaintiffs, and prompt resale to a third party, of the assets of a steel fabrication plant in Melrose Park, Illinois. Plaintiffs claim that Defendants' conduct in connection with the purchase and resale constituted a breach of fiduciary duties and breach of contract. The parties' cross-motions for summary judgment on the fiduciary duty claim (Count I of Plaintiffs' Amended Complaint) is addressed in another Report and Recommendation ("R & R on Count I") issued today. 870 F.Supp. 819. This Report addresses the parties' cross-motions on Count II, the contract claim.

Plaintiffs, FM Properties of Wisconsin, Inc., and CSFM Corporation, became owners of the Melrose Park plant as the result of a foreclosure by FM's parent, First Wisconsin National Bank ("FWNB"). As explained in the R & R on Count I, Defendants Phillip O. Elbert, William W. McKee, their partnership of Elbert & McKee Company, their colleague Raymond Jasica, and Chicago Steel Corporation are all diverse in citizenship from Plaintiffs. Plaintiffs allege that, at the time De-

fendants purchased the plant's assets, Defendants contracted to share with Plaintiffs the proceeds of any resale that occurred within two years. Defendants did re-sell the assets five months after the purchase from Plaintiffs; Plaintiffs allege that Defendants have breached their contract by refusing to share the proceeds from the resale.

## FACTUAL BACKGROUND: COUNT II

The following factual background is supported by the parties' Local Rule 12(M) and 12(N) statements.[1] Citations are also provided to other materials relied upon by the parties. Additional related facts can be found in the court's Report and Recommendation on Count I of Plaintiffs' Amended Complaint.

First Wisconsin National Bank (FWNB) and its wholly-owned subsidiary FM Properties, Inc. acquired the assets of a steel fabricating plant located in Melrose Park, Illinois through a deed in lieu of foreclosure when the plant's former owner defaulted on a loan from FWNB. (Plaintiffs' Rule 12(M) Statement on Count I, ¶¶ 7, 10.) FM Properties created a wholly-owned subsidiary, Chicago Steel/CSFM, to hold the assets.

In October 1984, FWNB, which had no experience in the operation of a steel plant, signed an agreement with Defendants Elbert and McKee to obtain certain consulting and other services for Chicago Steel/CSFM.[2] Elbert and McKee subsequently recruited Defendant Jasica to serve as President and Chief Executive Officer of Chicago Steel/CSFM. (Letter from Elbert to Jasica of 11/4/84, Ex. DX–16 to Plaintiffs' Rule 12(M) Statement on Count II.)

### A. Defendants' Purchase of Chicago Steel/CSFM

From the beginning of their relationship with Plaintiffs, Defendants understood that FWNB wanted to sell the company as soon as practicable. In March 1985, Defendants

---

1. Under the local rules in effect at the time, the parties filed some of their materials as Local Rule 12(L) statements.

2. The parties disagree over the exact nature and extent of those services, but this disagreement is not material to Count II.

notified Plaintiffs that they were interested in purchasing the company's assets themselves. (Minutes of Chicago Steel/CSFM Board of Directors' Meeting of 3/14/85, Ex. PX–32 to Plaintiffs' Rule 12(M) Statement on Count II.) On or about March 12, 1986, Defendants signed and sent a letter of intent to FWNB offering to purchase the company, free of all other debt, with a promissory note in the amount of $2,742,000 plus all of the company's "excess cash flow" in calendar year 1986. (Letter from Elbert, McKee, and Jasica to First Wisconsin National Bank of 3/12/86 ¶ 2, Ex. PX–46 to Plaintiffs' Rule 12(M) Statement on Count II.) The letter also provided that in the event Defendants resold the company within two years after closing, Defendants would pay Plaintiffs one-half (50%) of the amount by which the "net proceeds" of the resale exceeded $3,250,000. (*Id.* ¶ 3(d).)

Plaintiffs rejected Defendants' initial offer, and the parties continued to negotiate through the summer of 1986.[3] On or about August 19, 1986, Plaintiffs and Defendants signed an agreement in which Defendants, either individually or through a corporation they might form, agreed to purchase all of the assets of Chicago Steel/CSFM.[4] (Letter from Ehle, Fitzsimonds, and Giese[5] to McKee, Elbert, and Jasica of 8/19/86 (hereinafter "Purchase and Sale Agreement"), Ex. PX–5 of Plaintiffs' Rule 12(M) Statement on Count II.) The Purchase and Sale Agreement included the following provisions relevant to Count II:

1. *Purchase price.* The purchase price was defined as the sum of the following:

(a) The amount of $2,500,000 payable in cash at closing. (*Id.* ¶ 1(a).)

(b) An additional amount of $1,776,000, payable in cash at closing. This amount, however, would be reduced (or increased) by any cash payments made by (or to) Defendants to (or from) Plaintiffs prior to closing. (*Id.* ¶ 1(b).) Defendants contend, and Plaintiffs concede for purposes of this motion only, that Defendants paid Plaintiffs $776,000 in cash prior to closing, thus lowering the amount due under this subparagraph to $1,000,000. (Plaintiffs' Rule 12(M) Statement on Count II on Count II ¶ 20(b).)

(c) 1,500,000 shares of preferred stock, par value of $1.00 per share, to be issued by Defendants' corporation to Plaintiffs. The preferred stock would earn cash dividends at the annual rate of 5% and, for up to five years after closing, would be redeemed annually in an amount equal to 25% of the company's annual after-tax net earnings. At the end of five years or at such earlier time as Defendants might resell the company, Defendants had the option to redeem any remaining outstanding shares of preferred stock for the total sum of $1.00. (Purchase and Sale Agreement ¶ 1(c), Ex. PX–5 of Plaintiffs' Rule 12(M) Statement on Count II.)

2. *Split of Proceeds Upon Resale.* The Agreement also provided that in the event Defendants resold the company or substantially all of its assets within two years, Defendants were required to share a portion of any profit from that sale with Plaintiffs. Because of its central importance to Count II, this provision is reprinted in its entirety below:

---

**3.** The parties disagree as to whether they reached an oral agreement on the principal terms of a purchase and sale of the company in June or July 1986. This dispute is not material to the resolution of Count II.

**4.** Technically it was an agreement of the Seller Chicago Steel Corporation (here Chicago Steel/CSFM) and its Stockholders, FM Properties and its parent corporation First Wisconsin National Bank, to sell the assets of the Seller to Elbert, McKee, and Jasica, either individually and/or to a corporation formed by them for this purpose. (Purchase and Sale Agreement, Ex. PX–5 to Plaintiffs' Rule 12(M) Statement on Count II.) The Agreement referred collectively to Elbert, McKee, Jasica, and their corporation as the Buyers.

**5.** Roger Fitzsimonds was the Chairman of the Board of Chicago Steel/CSFM. Louis Giese was the Executive Vice President of FM Properties of Wisconsin, one of the Plaintiffs. Frederic Ehle was First Vice President of First Wisconsin National Bank and a Director of Chicago Steel/CSFM.

(d) In addition, if all or substantially all of the voting common stock or assets of New Corporation are sold within 2 years after the date of closing, Seller shall be entitled to 50% of the amount by which the *net proceeds of the sale* exceeds the sum of the following:

(i) All amounts actually paid to Seller in connection with the purchase and sale of assets contemplated hereby, including amounts (whether paid in respect of dividends of redemptions) actually paid with respect to the preferred stock; provided that for purposes of this subparagraph (d)(i), the amount paid to seller under subparagraph (b) above shall be deemed to be $1,776,-000;

(ii) All of the retained earnings of the New Corporation determined on a cumulative basis from the inception of New Corporation through the closing of such sale, less the amount of all dividends on and required redemptions of Preferred Stock that accrues prior to such closing but are not due to be paid until after such closing; and

(iii) Any cash capital contributed to the New Corporation before or after the closing of the sale and purchase of the assets of Seller to Buyer.

(*Id.* ¶ 1(d) (emphasis added).)

Significantly, the term "net proceeds"—a term that is the principal focus of the parties' dispute in Count II—is not defined anywhere in the Agreement, nor does the Agreement anywhere explicitly address the effect of debt or profits of Defendants' corporation on the "net proceeds" of the resale. Also, the parties refer to the sum of subparagraphs (i)-(iii) as the "trigger amount," a phrase that appears nowhere in the Agreement itself but will be adopted by the court for the sake of convenience and consistency with the parties' briefs.

## B. *Plaintiffs and Defendants Close the Deal*

On December 12, 1986, Plaintiffs and Defendants closed their purchase and sale of Chicago Steel/CSFM. (Plaintiffs' Rule 12(M) Statement on Count II ¶ 20.) For this purpose, Defendants formed a wholly-owned corporation to acquire the assets of Chicago Steel/CSFM.[6] (Defendants' Rule 12(M) Statement on Count II ¶ 2; Ex. PX–10 to Plaintiffs' Rule 12(M) Statement on Count II.) The principal components of this and related transactions were as follows:

1. Chicago Steel/CSFM gave Chicago Steel/Illinois a bill of sale, assignment and general conveyance of all of its assets. (Ex. F200970–973 to Plaintiffs' Rule 12(M) Statement on Count II.)

2. Defendants contend, and Plaintiffs concede for purposes of this motion only, that Defendants paid Plaintiffs $776,-000 in cash between the date of the Agreement and the closing. (Plaintiffs' Rule 12(M) Statement on Count II ¶ 20(b).)

3. Chicago Steel/Illinois obtained a $3,500,000 term loan from American National Bank ("ANB") and paid the money to Chicago Steel/CSFM to purchase its assets. (Ex. PX–10 to Plaintiffs' Rule 12(M) Statement on Count II; Elbert Dep., at 52; McKee Dep., at 52; Jasica Dep., at 179.) This amount covers the $2,500,000 payable under paragraph 1(a) of the Agreement and the $1,000,000 payable under paragraph 1(b) of the Agreement, as modified by the payment of $776,000 (above).

4. Chicago Steel/Illinois borrowed $2,800,000 from FWNB in exchange for a promissory note.[7] (Promissory

---

6. Defendants' corporation was originally named CSC Acquisition Corp., which subsequently assumed the name Chicago Steel Corporation upon the transfer of the assets of Chicago Steel/CSFM. For the purposes of this report, Defendants' corporation will be referred to as Chicago Steel/Illinois.

7. There is some disagreement between the parties as to whether the loan was actually owed to Chicago Steel/CSFM or FWNB, but given that Chicago Steel/CSFM was wholly-owned by FWNB, this dispute is not material to resolution of Count II.

Defendants explain that this loan was used to finance the purchase of Chicago Steel/CSFM's

Note, Ex. PX–11 to Plaintiffs' Rule 12(M) Statement on Count II.)

5. Chicago Steel/Illinois obtained a $1,000,000 revolving line of credit from American National Bank, which Defendants' corporation used for working capital. (Secured Promissory Note, Ex. PX–9 to Plaintiffs' Rule 12(M) Statement on Count II; Elbert Dep., at 52.)

6. Chicago Steel/Illinois issued 1,500,000 shares of preferred stock, par value of $1.00 per share, to Chicago Steel/CSFM in accordance with the parties' Purchase and Sale Agreement. (Plaintiffs' Rule 12(M) Statement on Count II ¶ 20.)

7. The individual Defendants guaranteed repayment of the loans from American National Bank and First Wisconsin National Bank but were not principally liable for them. (Guarantee Agreements, Exs. PX–10, PX–12 to Plaintiffs' Rule 12(M) Statement on Count II; Elbert Dep., at 51, 53–54; McKee Dep., at 52, 54; Jasica Dep., at 180, 192.)

8. In April 1987, Defendants paid Plaintiffs $25,891.48 to redeem some of Plaintiffs' preferred stock, pursuant to paragraph 1(c) of the Purchase and Sale Agreement. (Defendants' Rule 12(M) Statement on Count II ¶ 4; Jasica Aff. ¶ 9.)

In short, instead of personally borrowing or providing the money to purchase Plaintiffs' assets, Defendants borrowed all the necessary funds through their own corporation, Chicago Steel/Illinois. (Plaintiffs–Counterdefendants' Memorandum in Opposition to Defendants–Counterplaintiffs' Motion for Summary Judgment on Count II (hereinafter "Plaintiffs' Opposition II"), at 3–4.) At no time did Defendants put any of their own funds into Chicago Steel/Illinois. (Plaintiffs' Rule 12(M) Statement on Count II ¶ 20(d);

accounts receivable, one of the company's assets. (Defendants' Rule 12(M) Statement on Count II ¶ 10 (footnote).) As Plaintiffs point out, this fact undermines Defendants' claim that the purchase price for the company's assets was financed 100% by the loan from American National Bank. (Defendants' Rule 12(M) Statement on Count II

Elbert Dep., at 325–26; McKee Dep., at 48, 52, 54–56, 59–60; Jasica Dep., at 180, 266.)

### C. *Parties' December 11, 1986 Acknowledgement*

As part of the process of closing their deal, Plaintiffs and Defendants executed an Acknowledgement on December 11, 1986. (Attachment to Plaintiffs' Rule 12(N) Statement on Count II.) The Acknowledgement included several references to the Purchase and Sale Agreement, of which the following is most material:

(2) *Payment of Purchase Price.* The parties acknowledge and agree that the purchase price set forth in paragraphs 1(a) and (b) of the Agreement shall be payable as follows:

(a) The amount of $3,500,000 payable in cash at closing, and

(b) A promissory note of [Chicago Steel/Illinois] in the principal amount of $2,800,000 to be delivered to the Seller and secured by security interests granted to Seller in certain work-in-process, inventory, accounts receivable and contract rights, all as set forth in the promissory note and security agreement executed by [Chicago Steel/Illinois] and delivered to Seller on December 11, 1986.

*(Id.)*

As discussed below, the parties disagree as to how to interpret this provision's effects on the calculation of the trigger amount.

### D. *Defendants' Negotiations with Pitt–Des Moines, Inc.*

Prior to closing their deal with Plaintiffs, Defendants had discussions with senior officials of Pitt–Des Moines, Inc. ("PDM") about employment opportunities and the possible resale of Chicago Steel/CSFM's assets to PDM.[8] By January 27, 1987, Defendants

¶ 10; Plaintiffs' 12(N) Statement on Count II ¶ 10.)

**8.** These discussions, which Defendants did not reveal to Plaintiffs prior to purchasing Chicago Steel/CSFM, are the basis of Plaintiffs' claim of breach of fiduciary duty, which is discussed in

and PDM agreed to the basic terms of a purchase and sale of the assets, which they set forth in a letter of intent signed by all parties.[9] (Letter of Intent, Ex. PX–103 to Plaintiffs' Rule 12(N) Statement on Count II.) The letter stated:

> It is agreed that the purchase price for PDM to acquire Chicago Steel Corporation is a payment to the owners of Chicago Steel Corporation at the closing of $1,000,000 in cash and 147,727 shares of PDM common stock. It is also agreed that PDM will acquire all the assets of Chicago Steel and that PDM will assume all the debts and bank loan obligations of the Corporation.

(*Id.*)

PDM and Defendants finalized their transaction on April 15, 1987 in an Agreement and Plan of Reorganization involving PDM, Chicago Steel/Illinois, and Defendants as the stockholders in Chicago Steel/Illinois. (Ex. PX–13 to Plaintiffs' Rule 12(M) Statement on Count II.) The principal elements of this deal [10] were as follows:

1. PDM replaced Defendants as guarantor for at least $4,160,000 in debt still owed by Chicago Steel/Illinois to American National Bank. (Summary of Chicago Steel Acquisition, Outstanding Debt as of 4/9/87, Ex. PX–14 to Plaintiffs' Rule 12(M) Statement on Count II; Guaranty Agreement, Ex. PX–197 to Plaintiffs' Rule 12(M) Statement on Count II; Elbert Dep., at 51; McKee Dep., at 53; Jasica Dep., at 180.) [11]

2. PDM repaid Chicago Steel/Illinois' $2,800,000 loan from Plaintiffs. (McKee Dep., 54–56; Elbert Dep., at 67.)

3. PDM gave Defendants 119,949 shares of unregistered PDM stock in exchange for Defendants' 1,500 shares in Chicago Steel/Illinois.[12] (Jasica Aff. ¶ 6.) On April 15, 1987, the date of the transaction, PDM's registered common stock closed at $23.25. (Hogan Aff. ¶ 2; Records for PDM Stock, Ex. PX–145 to Plaintiffs' Rule 12(M) Statement on Count II), bringing the total value of Defendants' shares to $2,788,814.25.[13]

the R & R on Count I. For the purpose of resolving Count II, the parties' disagreement as to how serious these discussions were prior to December 1986 is not material.

9. Defendants deny that an agreement was reached at this time (Defendants' Response II ¶ 22), but this dispute is not material. The court notes, however, that the letter, which was signed by all three Defendants, states that it was drafted "to record the *understanding* between the officers and Pitt–Des Moines, Inc. and Chicago Steel Corporation" regarding the purchase of CSFM/Illinois and Defendants' employment with PDM. (Letter of Intent, Ex. PX–103 to Plaintiffs' Rule 12(N) Statement on Count II (emphasis added).) The letter also lists Defendants Elbert, McKee, and Jasica as being among those present at the negotiations. (*Id.*) The agreement was not binding upon the parties until approved by PDM's board of directors. (*Id.*)

10. Defendants point out that the transaction was technically not a sale but a reorganization and merger with PDM involving an exchange of stock, but for purposes of this motion, Defendants consent to call it a sale. (Defendants' Rule 12(N) Statement on Count II ¶ 5, Ft. 3.) Neither Plaintiffs nor this Court—nor Defendants, for that matter—believe this distinction is material.

11. Chicago Steel/Illinois' $4,160,000 debt to American National Bank consisted of $3,360,000 outstanding on the original $3,500,000 term loan and $800,000 outstanding on the $1,000,000 revolving line of credit. (Summary of Chicago Steel Acquisition, Outstanding Debt as of 4/9/87, Ex. PX–14 to Plaintiffs' Rule 12(M) Statement on Count II.) For the purpose of analyzing Count II, as explained more fully below, it is unnecessary to resolve the parties' disagreement as to whether PDM guaranteed or assumed the loans, or whether any such guarantee should be counted at the loan's face value.

12. Each of the three Defendants held 500 shares of Chicago Steel/Illinois stock. PDM converted each share into 79.966 shares of PDM stock, for a total of 119,949 shares of PDM stock. (Jasica Aff. ¶ 6.)

13. Defendants state their shares were unregistered and lightly traded and thus worth less than PDM's common stock. (Elbert Dep., at 404–405.) As pointed out by Plaintiffs, however, PDM agreed to obtain shelf-registration for Defendant's shares in order to facilitate their sale by Defendants. (Investment Letter and Registration Rights Agreement of 4/15/87, at 6, 7–8, Ex. PX–128 to Plaintiffs' Rule 12(N) Statement on Count II; Jasica Dep., at 235–37; McKee Dep., at 245.) Although PDM later chose, for accounting reasons, not to provide shelf-registration, it did give Defendants the right to sell their shares

4. PDM gave Defendants employment bonuses and five-year contracts worth $1,500,000. (Jasica Aff. ¶ 9.)

5. Defendants paid Plaintiffs $25,891.48 to redeem some of Plaintiffs' preferred stock, pursuant to paragraph 1(c) of the Purchase and Sale Agreement. (Defendants' Rule 12(M) Statement on Count II ¶ 4; Jasica Aff. ¶ 9.)

The first element above, the debts owed to American National Bank, is the central focus of dispute between the parties on Count II. Defendants emphasize that they were never personally liable for the debts (other than as guarantors), which remained on the books of Chicago Steel/Illinois both before and after the sale to PDM. (Jasica Dep.[14], at 290–91; Elbert Dep., at 77; McKee Dep., at 48, 54–56.) Defendants also state that they had not personally purchased Chicago Steel/CSFM's assets; rather, those assets were purchased by Chicago Steel/Illinois. (Ex. A to Defendants' Rule 12(M) Statement on Count II.) Consequently, Defendants argue that the debts should be not included among the "net proceeds" of the sale to PDM. Plaintiffs, however, argue the debt should be counted as "net proceeds," given the structure of both transactions and the intent of the parties. This issue will be explored in the Discussion section below.

## DISCUSSION: COUNT II

In Count II, Plaintiffs claim that Defendants breached their obligations under paragraph 1(d) of the Purchase and Sale Agreement to share the proceeds from any resale of the plant. As discussed above, paragraph 1(d) provided that in the event Defendants resold the assets of Chicago Steel/CSFM within two years, Defendants would pay Plaintiffs one-half (50%) of the amount by which the "net proceeds" of the resale exceeded the trigger amount, i.e., the sum of all amounts actually paid to Plaintiffs, plus the company's retained earnings less dividends and redemptions of stock, and any cash capital contributed by Defendants to the company.

Both parties have moved for summary judgment on Count II. Plaintiffs argue that PDM's assumption and guarantee of Chicago Steel/Illinois' debts should be counted toward the "net proceeds" of the sale. On this basis, Plaintiffs calculate that the amounts owed them equal $1,361,400.[15] Defendants, however, argue that PDM's guaranty of the company's debts should not be included in "net proceeds" and that Plaintiffs have miscalculated the "trigger amount" by at least $1,000,000. As a result, Defendants contend they owe Plaintiffs nothing because the net

---

to the company at market price. (Elbert Dep., at 69–73). In fact, Jasica and Elbert have each sold some 10,000 shares at market price. (Jasica Dep., at 318–29; Elbert Dep, at 406.) Consequently, Defendants' objections are immaterial and unsupported by the record, and the court will consider Defendants' unregistered shares in PDM to equal a comparable number of shares of PDM common stock.

14. Jasica, however, also testified that he considered any payments made by Chicago Steel/Illinois to come out of his personal funds. (Jasica Dep., at 265–66.) ("I would assume Chicago Steel, since I am a third owner, is part of my personal assets; so therefore, if money came out of Chicago Steel, it came out of me.")

15. Plaintiffs' conclusion is based on the following calculation (with some rounding):

| Net Proceeds of Sale to Pitt–Des Moines | | Trigger Amount, from Parties' Purchase & Sale Agreement | |
|---|---|---|---|
| PDM stock: | $2,788,800 | Cash paid Plaintiff [¶ 1(d)(i) ]: | $2,500,000 |
| Debt owed ANB: | 4,160,000 | Cash paid Plaintiff [¶ 1(d)(i) ]: | 1,776,000 |
| Subtotal | $6,998,800 * | Subtotal: | $4,276,000 |
| Net proceeds less Trigger Amount = | | | $2,722,800 |
| × ½ (Plaintiffs' share) = | | | $1,361,400 |

(Plaintiffs' Brief II, at 6.)

\* Due to an error in addition, Plaintiffs' subtotal for "net proceeds" is $50,000 too high (the subtotal of the proceeds should be $6,948,800).

proceeds are at least $1,013,000 less than the trigger amount.[16]

Count II does not turn on complicated questions of fact, as was the case in Count I, but it does raise some novel questions of law for the court. The parties do not cite, nor has this court found, any case directly on point on the question whether the buyer's guaranty or assumption of a corporation's debt should be included in the net proceeds of the sale. Moreover, after analyzing the relevant agreements and transactions, the court concludes that while the net proceeds of the sale did indeed exceed the trigger amount, both parties have miscalculated the amount owed the Plaintiffs.

This Report presents the court's own calculations of the net proceeds, trigger amount, and amount owed Plaintiffs. The court recognizes that the parties have not had an opportunity to address this court's calculations, but the parties are free to do so through objections to this Report and Recommendation.

### A. *Legal Standards*

■ Before turning to the parties' arguments, the court will review the legal standards for interpreting a contract and deciding a motion for summary judgment. Neither party has raised a conflict of law issue in this diversity case nor do the relevant contracts include a choice of law provision; thus, the court is directed to apply the law of the state in which it sits, namely, Illinois. *See Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426 (7th Cir.1991) (when neither party raises a conflict of law issue in a diversity case, federal court simply applies law of state in which federal court sits). The court further notes that for purposes of this issue there appear to be no substantive differences between the common law of Illinois and Wisconsin, both of which are cited by the parties.

■ It is well-settled that construction of a written contract is a question of law for the court to decide. *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir.1993) (recognizing this principle as a matter of federal law); *Badger Pharmacal, Inc. v. Colgate–Palmolive Co.*, 1 F.3d 621 (7th Cir.1993); *Jones v. Jenkins*, 88 Wis.2d 712, 722, 277 N.W.2d 815, 819 (1979). In such a case, a court is obligated to construe the words of the contract in accordance with their "usual, common, and ordinary meaning." *Kinn v. Coast Catamaran Corp.*, 582 F.Supp. 682, 686 (E.D.Wis.1984), *citing Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 355 (7th Cir.1982). Moreover, the "plain meaning" of the contract controls even though the parties themselves may have placed a different meaning on it. *Badger Pharmacal, Inc.*, 1 F.3d at 629; *Kinn*, 582 F.Supp. at 686. In other words, the language of a contract must be understood to mean what it clearly expresses, and the court may not depart from the plain meaning when the contract is free from ambiguities. *First Wisconsin National Bank v. Ford Motor Credit Corp.*, 94 Wis.2d 622, 637, 289 N.W.2d 288, 295 (1980). Finally, when the language is unambiguous, parol evidence is not admis-

---

16. Defendants' conclusion is based on the following calculation (with some rounding):

| Net Proceeds of Sale to Pitt–Des Moines | | Trigger Amount, from Purchase & Sale Agreement, as Amended | |
|---|---|---|---|
| PDM stock: | $2,788,814 | Cash paid Plaintiffs [¶ 1(d)(i) ]: | $3,500,000 |
| Bonuses: | 1,500,000 | Cash paid Plaintiffs [¶ 1(d)(i) ]: | 1,776,000 |
| | | Stock redemptions [¶ 1(d)(i) ]: | 25,891 |
| Subtotal | $4,288,814 | Subtotal: | $5,301,891 |

Net proceeds < Trigger Amount, so Plaintiffs get **$0.00**.
(Defendants' Memorandum II, at 4–5.) Defendants maintain that their employment contracts and bonuses should not be counted as "net proceeds" and have included them here only for illustration. (*Id.*) Defendants also contend that the Acknowledgement signed by the parties in December 1986 amended the Purchase and Sale Agreement, which accounts for the differences in "Cash paid Plaintiffs" between Defendants' and Plaintiffs' calculation.
(Defendants' Reply II, at 11–12.)

sible to explain, contradict, enlarge, or modify the writing as it exists when executed. *Lockwood v. Goldman*, 345 Ill.App. 324, 326, 102 N.E.2d 828, 829 (2d Dist.1952).

A court may find, as a matter of law, that an ambiguity exists in the contract. *Capital Investments, Inc. v. Whitehall Packing Co.*, 91 Wis.2d 178, 189, 280 N.W.2d 254, 259 (1979) (question whether an ambiguity exists is a question of law). Should the court find a contract term ambiguous, then resolution of that ambiguity becomes a question of fact for the factfinder to decide. *Jones v. Jenkins*, 88 Wis.2d at 722, 277 N.W.2d at 819. An ambiguity exists when a provision is reasonably and fairly susceptible to more than one construction. *Id.* In the event of an ambiguity, the court may not redraft the agreement, *id.*, but must attempt to resolve the ambiguity by determining the intent of the parties at the time they entered into the agreement. *Capital Investments*, 91 Wis.2d at 190, 280 N.W.2d at 259. To resolve an ambiguity and determine the parties' intent, the court may look beyond the face of the contract and consider extrinsic evidence or rely on canons of construction designed to ascertain the intentions of the parties. *Id.* Such canons of construction include the following:

- The court should consider any ambiguous terms in the context in which they are written. *Wausau Joint Venture v. Redevelopment Authority of Wausau*, 118 Wis.2d 50, 58, 347 N.W.2d 604, 608 (Wis.Ct.App.1984).

- The court should select a construction that gives effect to each part of the contract while rejecting constructions that lead to surplusage or unreasonable, unfair, or unusual results. *Id.*, citing *Jones v. Jenkins*, 88 Wis.2d at 722, 277 N.W.2d at 819.

- The court should construe any ambiguity against the party that drafted the provision in question. *Capital Investments*, 91 Wis.2d at 190, 280 N.W.2d at 259; *Jones v. Jenkins*, 88 Wis.2d at 722, 277 N.W.2d at 819.

Given the present status of this case, any ambiguity in the contract or other question of fact raises another issue for consideration—the standard for summary judgment. A court may grant a motion for summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue exists only if there is sufficient evidence for a reasonable jury to return a verdict favorable to the non-movant. *Id.* at 249, 106 S.Ct. at 2510; *Valley Liquors, Inc. v. Renfield Importers Ltd.*, 822 F.2d 656 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). A court is obligated to draw all reasonable inferences in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985).

Summary judgment is particularly appropriate in cases involving the interpretation of contractual documents. *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir.1989). In that context, summary judgment should be entered if the pertinent provisions of the contract are unambiguous; the absence of ambiguity in the terms of the contract forecloses any genuine issues of material fact. *Id.* If, on the other hand, the court were to find an ambiguity in the contract, then summary judgment may be granted only if the court were to conclude that there is no genuine issue with respect to any fact that is material to the resolution of the ambiguity. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510.

### B. *Analysis of the Contract*

Unlike Count I, many of the material facts relevant to Count II are uncontested. For example, there is no genuine issue with respect to the amount or nature of payments made by Defendants to Plaintiffs to purchase Chicago Steel/CSFM's assets, or made by PDM to Defendants to purchase such assets and to hire the Defendants. In addition, there is no genuine issue with regard to the wording of the various agreements, or the fact that Defendants resold the company's

assets within two years (in fact, only five months) after purchasing them from Plaintiffs.

The parties strongly disagree, however, on the interpretation of two important provisions in paragraph 1(d) of the August 1986 Purchase and Sale Agreement—the first being the definition of "net proceeds"; and the second being the calculation of the so-called trigger amount. Where questions of law are involved, the court is free to offer its opinion. Where questions of fact involved, the court will remain mindful of the canons of construction for contracts and the standards for summary judgment. The court will address each of these two provisions in turn.

### 1. Definition of "Net Proceeds"

The parties strongly disagree over the meaning of "net proceeds," as used in paragraph 1(d) of their August 1986 Purchase and Sale Agreement. Specifically, the parties are at odds over whether PDM's guaranty or assumption of the debts of Chicago Steel/Illinois should be counted as proceeds.

#### a. "Net Proceeds" is an ambiguous term in the Agreement

 The parties' first point of contention is whether "proceeds" has a plain meaning or is an ambiguous term in the contract. Defendants argue that the term "proceeds"[17] does have a plain meaning, which this court must adopt when interpreting the contract. See, e.g., First Wisconsin National Bank, 94 Wis.2d at 637, 289 N.W.2d at 295 (court may not depart from plain meaning of the contract when the contract is free from ambiguities); Kinn, 582 F.Supp. at 686 (words of a contract are to be construed in accordance with their usual, common, and ordinary meanings). Relying on Webster's dictionary and case law, Defendants argue that the plain meaning of "proceeds" is that which is "derived" or "actually received" from a sale or transaction. WEBSTER'S NEW WORLD DICTIONARY, 2ND COLLEGE EDITION (1982) ("proceeds" is that which is "derived from a sale, business venture, etc."); Bank of Silvis v. Boultinghouse Auction Co., 71 Ill.App.3d 98, 101, 27 Ill.Dec. 455, 457, 389 N.E.2d 267, 269 (3d Dist.1979) ("proceeds" are generally construed as "something actually received in hand.")[18]

As Plaintiffs observe, however, a number of courts have found the term "proceeds," when standing alone, to be ambiguous and susceptible to varying meanings. See 2416 Corp. v. First National Bank of Chicago, 91 Ill.App.3d 961, 971, 47 Ill.Dec. 415, 423, 415 N.E.2d 420, 428 (1st Dist.1980) (term "proceeds" must be construed in context of its use); Gould v. Lewis, 267 Ill.App. 569, 572–73 (1st Dist.1932). Even in Bank of Silvis — a key case cited by the Defendants—the court held that while the term "proceeds" is one of "general understanding," nonetheless it is also one of "equivocal import and great generality" and susceptible to "varying meanings and usages." 71 Ill.App.3d at 100, 27 Ill.Dec. at 456, 389 N.E.2d at 268 (cites omitted).[19] Given the ambiguity of the term

---

**17.** Neither Plaintiffs nor Defendants assert that there is any material distinction between "net proceeds" and "gross proceeds" in this case. (Plaintiffs' Brief II, at 5 (footnote); Defendants' Memorandum II, at 5 (footnote).)

**18.** Defendants (and Plaintiffs) also refer to Black's Law Dictionary, which defines "proceeds" as—

(M)oney or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property.... That which results, proceeds, or accrues from some possession or transaction. State Highway Cmsn. v. Spainhower, 504 S.W.2d 121, 125 [(1973)]. The funds received by the disposition of assets or from the issue of securities (after deduction of all costs and fees). As used in the context of debtor's sale of

collateral, 'proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.... U.C.C. § 9–306.

BLACK'S LAW DICTIONARY 1204–05 (6th ed. 1990).

**19.** The court recognizes, as Defendants assert, that in many instances the ambiguity is between "net" and "gross" proceeds, see, e.g., 2416 Corp., 91 Ill.App.3d at 971, 47 Ill.Dec. at 423, 415 N.E.2d at 428, a matter that neither party has asserted as an issue in this case. The court, however, disagrees with Defendants' claim that this is the only source of ambiguity in the term. (Defendants' Opposition II, at 4.) For example, in Bank of Silvis, the court had to determine whether a auctioneer's commission should be based on the bidder's price or on monies actually received from buyer, 71 Ill.App.3d at 107, 27 Ill.Dec. at 456–57, 389 N.E.2d at 268–69 (held

"proceeds" in the parties' Agreement, this court must construe the term according to its context and subject matter to which it is applied. *Id.*

### b. *Purpose of Paragraph 1(d) of the Agreement*

Plaintiffs contend that paragraph 1(d) was inserted into the Agreement for several reasons. First, Plaintiffs were concerned that Defendants, who had greater knowledge and experience in the steel business, may be purchasing Chicago Steel/CSFM's assets from Plaintiffs at an unfairly low price. Plaintiffs believed, therefore, that any increment that Defendants may obtain were they to resell the company quickly (i.e., within two years) would more likely reflect the inherent value of the assets than any value added by virtue of Defendants' efforts. After two years, however, it would be fair to assume that any appreciation in the assets resulted from Defendants' contributions as owners and senior officers of the company.

Secondly, Plaintiffs claim that paragraph 1(d) was inserted to protect the value of Plaintiffs' shares of Chicago Steel/Illinois, which were to be redeemed from the company's retained earnings over a period of five years. Were Defendants to resell the company within two years, Plaintiffs would be at risk of losing this right of redemption. Paragraph 1(d) was meant to provide some measure of compensation for this loss, say the Plaintiffs.

Defendants criticize both of Plaintiffs' arguments, although they do not offer their own explanation for the inclusion of paragraph 1(d). In particular, Defendants point out that the steel plant continued to suffer chronic losses after its sale to Defendants and thereafter.[20] Given that the Agreement provided that Plaintiffs' stock could be redeemed only from the company's retained earnings, which were negative, Defendants argue that it was entirely implausible for Plaintiffs to claim that paragraph 1(d) was meant to provide compensation for their shares.

Both parties here rely almost exclusively on the terms of the Agreement and its context, rather than on parol evidence. This court finds Plaintiffs' first explanation to be entirely plausible and consistent with the circumstances that then existed. With this in mind, the court does not believe it is necessary to determine whether paragraph 1(d) was also meant to provide Plaintiffs some measure of compensation for lost stock redemptions.

### c. *"Proceeds" means something actually received but need not be received by Defendants personally*

The main thrust of Defendants' argument is that "net proceeds" should be interpreted as that which was *actually* and *personally* received by Defendants. Relying again on Webster's, *Bank of Silvis,* and other sources, Defendants assert that since "proceeds" means something actually received in hand, the term excludes anything not received by Defendants themselves. In particular, Defendants contend that because they were never personally liable for the debts of Chicago Steel/Illinois (other than as guarantors), then PDM's assumption and guaranty of those debts cannot be counted against Defendants as proceeds of the sale.

The court agrees with Defendants to the extent that "proceeds" includes only that which was actually received, as opposed to that which is merely speculative or promised

that "proceeds" were monies were actually received, not merely promised and unpaid). Also, in *Sondrol v. Placid Oil Corp.,* 23 F.3d 1341 (8th Cir.1993), the court had to determine whether "proceeds" from an oil and gas lease were limited to cash paid by the buyer or should also include credit that the buyer gave the operator for dry gas placed in storage, and concluded there that only cash actually paid was included.

**20.** Defendants have submitted tax returns showing that the Melrose Park plant suffered losses of $665,826 in 1984, $1,549,006 in 1985, and $67,-787 in 1986. (Corporation & Replacement Income Tax Returns, Ex. G, H, I to Defendants' Response II.) After its sale to PDM, the plant experienced a modest gain of $282,135 in 1987, but losses of $90,000 in 1988 and $866,191 through June of 1989. (Corporation & Replacement Income Tax Returns, Exs. K, L, M to Defendants' Response II.) Plaintiffs, however, assert that these are reports based on taxable income, which may not have any necessary relationship to the actual profitability of the plant. (Plaintiffs' Reply II, at 6.) This dispute, however, is not material to resolving Count II.

but never delivered. This interpretation is consistent with the general understanding of the term as applied in case law and other sources. *See, e.g., Bank of Silvis,* 71 Ill. App.3d at 101, 27 Ill.Dec. at 457, 389 N.E.2d at 269 ("proceeds" of an auction means monies actually received, not the bid price on which bidder later defaulted); *Sondrol v. Placid Oil Co.,* 23 F.3d 1341, 1344 (8th Cir. 1993) ("proceeds" received by well operator included only the cash paid by the buyer and not the credit which the buyer gave the operator for dry gas placed in storage); BLACK'S LAW DICTIONARY 1204 ("proceeds" are "monies or articles or other things of value" arising from a transaction). This interpretation is also consistent with the intent of paragraph 1(d) of the Agreement, which in addition to "net proceeds" also speaks of funds "actually paid" to the Seller, cash capital contributed to the corporation, stock dividends and redemptions, and other tangible, quantifiable receivables.

The court disagrees, however, with Defendants' argument that a payment must be received by the individual Defendants themselves in order to count as proceeds. The court believes this interpretation is too narrow, given the terms of the Agreement as a whole and the overall context in which it was written. The problem may stem from the fact that the definitions of "proceeds" in BLACK'S LAW DICTIONARY, *Bank of Silvis,* and other authorities are drafted in the passive voice. BLACK'S LAW DICTIONARY, in particular, is very clear on the "what" that counts as proceeds in a transaction, but it says nothing of the "who" that receives the proceeds.

Defendants contend, in effect, that the "who" should be limited to the individual Defendants themselves and should not include Chicago Steel/Illinois, presumably because as a matter of law the company is a separate legal entity. The court recognizes that Defendants Elbert, McKee, and Jasica were not personally liable for the debts of Chicago Steel/Illinois (other than as guarantors), and that the company's debts remained on its books before and after the sale to PDM. Nonetheless, it is not the liability on the company's debt that is at issue but the nature of the Agreement with Plaintiffs and

the subsequent sale to PDM. The court notes that the negotiation and implementation of the August 1986 Purchase and Sale Agreement involved at least seven parties (not including the lender American National Bank), listed below:

*Acting as or on behalf of the Seller were:*
- Chicago Steel/CSFM, as seller of the assets;
- FM Properties, as stockholder in Chicago Steel/CSFM; and
- First Wisconsin National Bank, as stockholder in Chicago Steel/CSFM and lender to Defendants.

*Acting in the role of Buyers were:*
- Defendants Elbert, McKee, and Jasica in their individual capacities as guarantors of the loans from FWNB and ANB and sole stockholders in Chicago Steel/Illinois; and
- CSC Acquisition Corp. (later renamed Chicago Steel Corp. and referred to here as Chicago Steel/Illinois), a corporation formed by Defendants to acquire the assets to Chicago Steel/CSFM.

This complex structure of individuals, corporations, subsidiaries, and holding companies was not only necessary to the transaction between Plaintiffs and Defendants, it was in fact anticipated by the parties. The Agreement spoke of the "Buyers" as being, collectively, Elbert, McKee, and Jasica and/or any corporation they formed for this purpose. (Purchase and Sale Agreement, Ex. PX–5 to Plaintiffs' Rule 12(M) Statement on Count II.) Furthermore, only in this way were the individual Defendants able to assume complete ownership and control over the assets of Chicago Steel/CSFM without putting down any of their own money or personally taking out any loans to pay for the acquisition. Within this context, the parties should not have been surprised that any resale of Chicago Steel/CSFM's assets likely would involve a similarly intricate arrangement. This point may be made clearer by comparing the list above with a list of the individuals and companies involved in the sale of Chicago Steel/Illinois to PDM:

*Acting as or on behalf of Sellers were:*
- Defendants Elbert, McKee, and Jasica in their individual capacities, who received

stock shares and employment contracts and were replaced as guarantors on debts owed to FWNB and ANB; and

- Chicago Steel/Illinois, which sold its assets to PDM.

*Acting as Buyers were:*

- PDM, which repaid the $2,800,000 loan to Plaintiffs and replaced Defendants as guarantors of the outstanding loans to ANB; and

- Chicago Steel/PDM [21], which was merged with PDM but continued to hold the debts owed to FWNB and ANB.

Only by considering the individual Defendants and Chicago Steel/Illinois collectively as Sellers can this transaction be made consistent with the Defendants' original purchase of Chicago Steel/CSFM's assets from Plaintiffs. Just as Elbert, McKee, and Jasica, acting in their personal capacity, did not acquire the assets of Chicago Steel/CSFM, so they did not, in their personal capacity, transfer Chicago Steel/Illinois' assets to PDM. Rather, the sale required that Elbert, McKee, Jasica, and Chicago Steel/Illinois act collectively as sellers, just as they once had acted collectively as buyers. Therefore, this court believes that the "net proceeds" of the resale, as the term is used in the Agreement, should include items actually received by all the individual Defendants, *and* Chicago Steel/Illinois. To separate the individual Defendants from Chicago Steel/Illinois for the purpose of calculating the proceeds would be inconsistent with the nature and context of the Agreement in question and therefore would lead to an unfair, unreasonable, or unusual result. *See, e.g., Jones v. Jenkins,* 88 Wis.2d at 722, 277 N.W.2d at 819.

With this analysis as background, the court will now turn to the parties' views on what should constitute the "net proceeds" of Defendants' sale of Chicago Steel/Illinois' assets to PDM. The court finds that neither party has properly calculated the net proceeds and offers its own result.

### d. Whether "Net Proceeds" is Equivalent to "Profits" is Immaterial

The parties expended a great deal of effort arguing whether "net proceeds" is equivalent to "net profits." Plaintiffs, relying partly on parol evidence, assert that "proceeds" should equal "profits" (Plaintiffs' Brief in Support of Motion for Summary Judgment on Count II (hereinafter "Plaintiffs' Brief II"), at 10; Plaintiffs' Reply in Support of Their Motion for Summary Judgment on Count II (hereinafter "Plaintiffs' Reply II"), at 5–10), while Defendants argue that this interpretation must be rejected because it is contrary to the plain meaning of the term. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment on Count II (hereinafter "Defendants' Opposition II"), at 3, 7–9.)

Despite the amount of ink that has been spilt over this issue, this court does not believe it is necessary to determine whether the parties used "proceeds" to mean "profits." Having relied on the face of the Agreement itself and the context in which it was prepared, the court has concluded that "net proceeds" refers to items actually received by the individual Defendants and Chicago Steel/Illinois, acting collectively in the role of sellers. Plaintiffs' introduction of the term "profits" and the parol evidence of individuals who participated in drafting the Agreement does not further clarify the issue. In fact, nowhere have Plaintiffs actually defined "profits" or how that term differs from Defendants' interpretation of proceeds.[22] The court believes its own approach is clearer, more direct, and consistent with the intent of the parties.

### e. The Court's Interpretation of What Constitutes the "Net Proceeds" of Defendants' Sale of Chicago Steel/Illinois to PDM

As mentioned above, there were four principal components to PDM's purchase of Chicago Steel/Illinois, which were (in brief):

---

**21.** The court will use "Chicago Steel/PDM" to refer to the company when it was purchased by and merged with PDM.

**22.** Black's definition of "profits" ties it directly to "proceeds", i.e., profits are "(m)ost commonly, the gross proceeds less the costs of the transaction; i.e., the *net proceeds.*" BLACK'S LAW DICTIONARY 1211 (6th ed. 1990) (emphasis added).

1. Defendants received 119,949 shares of unregistered PDM stock, with a market value of $2,788,814.25 at the time of the transaction;

2. Defendants received $1,500,000 worth of employment contracts and bonuses;

3. PDM repaid Chicago Steel/Illinois' $2,800,000 debt to Plaintiffs; and

4. PDM replaced Defendants as guarantor of the $4,160,000 in debts owed to American National Bank.

The court believes that with the exception of item 2, each of these four components should be included in the net proceeds of the sale. With regard to the first item, Defendants obviously received tangible benefits from the shares of stock in PDM. The same is true of their employment contracts and bonuses; however, because Plaintiffs have stated that their rights to the second item rests on contested facts (Plaintiffs' Brief II, at 2 (footnote)), the court cannot include it on a summary judgment motion. With regard to the third item, Chicago Steel/Illinois received an obvious benefit in the form of $2,800,000 in debt relief, which must be counted toward the net proceeds because the transaction must be viewed as a whole.

Finally, the court concludes that PDM's guaranty of the debts owed to American National Bank should be counted as net proceeds. Defendants have strongly opposed this conclusion, based on two main arguments—first, that the individual Defendants were not principally liable for the debts, and thus the debts should not be counted against their net proceeds; and second, the debt remained on the books of Chicago Steel/Illinois before and after the sale to PDM and thus nothing was "actually received" in the transaction. With regard to the first argument, this court concluded previously that the sale to PDM must be viewed as a whole, so anything received by Chicago Steel/Illinois or the individual Defendants must be counted as net proceeds.

As for the second line of argument, the court notes that an important part of the transaction was the merger of Chicago Steel/Illinois with PDM; in effect, the transfer of assets (and debt) from Chicago Steel/Illinois to Chicago Steel/PDM. Whereas Defendants were once ultimately responsible for the debts of Chicago Steel/Illinois, either as sole stockholders in the corporation or as guarantors of its debt, PDM subsequently became responsible for the debts, either as the company's new owner or as guarantor of its debts. In other words, PDM stands in the same relationship to Chicago Steel/PDM as Defendants stood in relation to Chicago Steel/Illinois. Viewed in this way, PDM and Chicago Steel/PDM received the assets of Chicago Steel/Illinois in exchange for assuming its debts and guarantees, both of which should be counted as net proceeds received by the individual Defendants and Chicago Steel/Illnois, collectively. Again, the sale of the company to PDM, like its original sale to Defendants, must in fairness be viewed in its entirety.

Taking these three elements together, the court concludes that the total net proceeds of the sale to PDM were **$9,748,814.25,** i.e., the sum of the $2,788,814.25 in stock, $2,800,000 in debt repaid to Plaintiffs, and $4,160,000 in debt owed to American National Bank.

### 2. Calculation of the Trigger Amount

The court now turns to the parties' disagreement over the calculation of the trigger amount. The source of the parties' disagreement is not the Purchase and Sale Agreement itself but the effect of their December 1986 Acknowledgement, which referenced and, according to Defendants, amended the Agreement. Unlike the dispute over "net proceeds," the trigger amount presents no ambiguous terms or questions of fact for the court. Thus, the court may analyze the trigger amount as a matter of law.

As discussed in the Factual Background, paragraph 1(d) of the parties' Purchase and Sale Agreement provided that Defendants must pay Plaintiffs one-half of the amount by which the net proceeds of a resale exceed the sum of three factors (the so-called trigger amount):

1. All amounts actually paid to Plaintiffs, including redemptions of stock from Chicago Steel/Illinois. The Agreement also provided that for the purposes of

this section, the amount paid under paragraph 1(b) would be considered to be $1,776,000, regardless of any amounts paid or owed to Plaintiffs prior to the sale to Defendants;

2. All of the retained earnings of Defendants' corporation, less any amounts paid for stock dividends or redemptions; and

3. Any cash capital contributed to the corporation before or after closing of sale to Defendants.

When Plaintiffs and Defendants closed the deal in December 1986, they executed an Acknowledgement that referenced the Agreement. Paragraph 2 of the Acknowledgement stated that the "purchase price" set out in paragraphs 1(a) and (b) of the Agreement would be payable in the form of $3,500,000, paid in cash at closing, and a promissory note from Chicago Steel/Illinois in the principal amount of $2,800,000, to be delivered to Chicago Steel/CSFM. (Acknowledgement ¶¶ 2(a, b).)

Defendants argue that the Acknowledgement had the effect of increasing the trigger amount originally described in the Purchase and Sale Agreement. Specifically, Defendants assert that the effect of paragraph 2(a) of the Acknowledgement was to increase the amount in paragraph 1(a) of the Agreement from $2,500,000 to $3,500,000, and the effect of paragraph 2(b) of the Acknowledgement was to increase the amount in paragraph 1(b) of the Agreement from $1,776,000 to $2,800,-000. Plaintiffs disagree with this interpretation, arguing that the $3,500,000 in paragraph 2(a) of the Acknowledgement was the sum of $2,500,000 in paragraph 1(a) of the original Agreement and $1,000,000 left to be paid of the $1,776,000 originally due under paragraph 1(b). Thus, Plaintiffs argue, Defendants miscalculated the trigger amount by at least $1,000,000.

The court concludes that Plaintiffs' interpretation is correct. The Acknowledgement did not expressly amend the Purchase and Sale Agreement or the total purchase price; rather, it only specified the manner in which that price was to be paid. Defendants offer no evidence showing that the parties intended to increase the purchase price; thus, the price in both the Acknowledgement and the Agreement should be consistent. As Plaintiffs have pointed out, the two amounts are consistent when one keeps in mind that Defendants had already paid $776,000 of the original $1,776,000 owed under paragraph 1(b) of the Agreement, and that the $2,800,-000 promissory note was meant to cover a delayed payment on an accounts receivable. Thus, for the purposes of calculating the trigger amount, the amounts received by Plaintiffs under subparagraph 1(d)(i) should include the $3,500,000 paid in cash at closing, the $776,000 previously paid by Defendants, and the $2,800,000 promissory note.

The court further concludes that under subparagraph 1(d)(i) of the Agreement, the trigger amount should also include the $25,-891.48 paid by Defendants (or PDM) in April 1987 to redeem some portion of Plaintiffs' shares of Chicago Steel/Illinois stock. (This fact was asserted by Defendants and not challenged by Plaintiffs.) In addition, the $1,000,000 loan from American National Bank, which Defendants used as working capital for Chicago Steel/Illinois (Elbert Dep., at 52), should be included as cash capital contributed to the corporation under subparagraph 1(d)(iii).[23] Finally, the parties agree that Chicago Steel/Illinois had no retained earnings during the relevant time period, so the amount under subparagraph 1(d)(ii) is zero.

Based on the foregoing, the court concludes that the trigger amount is **$8,101,-891.48**, which is the sum of the following:

- $3,500,000 paid to Plaintiffs in cash;

**23.** The court notes that although neither party has made this assertion, this conclusion follows from the terms of the Agreement itself. In addition, this conclusion is consistent with Plaintiffs' response to Defendants' hypothetical (Defendants' Opposition II, at 5; Plaintiffs' Reply II, at 8–9), in which Plaintiffs contend that any funds borrowed by Defendants' corporation above those required to pay the purchase price should be counted as capital contributions under paragraph 1(d)(iii) of the Agreement. The court takes this moment to conclude that Plaintiffs' response to Defendants' hypothetical is correct.

- $2,800,000 promissory note given to Plaintiffs;
- $776,000, presumed paid to Plaintiffs prior to closing;
- $25,891.48 paid to redeem preferred stock; and
- $1,000,000 cash capital contributed to the corporation.

## CONCLUSION

As stated above, the court found the net proceeds of the sale to PDM to equal $9,748,814.25 and the trigger amount to equal $8,101,891.48. The amount by which the net proceeds exceed the trigger amount is $1,646,922.77, of which Plaintiffs are entitled to half, or $823,461.38. Therefore, the court recommends that Defendants' motion for summary judgment on Count II be denied and that Plaintiffs' motion be granted in the amount of **$823,461.38**. These results are summarized below.

As stated earlier, the court recognizes it has not been fully briefed on this matter and that its conclusions differ from those presented by either party. The parties remain free to voice their disagreement with this analysis by way of objections to this Report.

## SUMMARY OF COURT'S CALCULATION OF AMOUNTS DUE PLAINTIFFS

"Net Proceeds" From Sale of Chicago Steel/Illinois to PDM

| | | |
|---|---|---:|
| • | Value of PDM Stock | $2,788,814.25 |
| • | Repayment of loan to Plaintiffs | 2,800,000.00 |
| • | Guaranty of loans to ANB | 4,160,000.00 |
| | Subtotal, Net Proceeds | $9,748,814.25 |

"Trigger Amount," from Paragraph 1(d) of Agreement

| | | |
|---|---|---:|
| • | Amounts paid Plaintiffs, ¶ 1(d)(i) | |
| | Cash paid at closing | $3,500,000.00 |
| | Promissory note | 2,800,000.00 |
| | Cash paid before closing | 776,000.00 |
| | Stock redemptions on 4/87 | 25,891.48 |
| | Subtotal, ¶ 1(d)(i) amount | $7,101,891.48 |
| • | Retained earnings under ¶ 1(d)(ii) | 0.00 |
| • | Capital contributions, ¶ 1(d)(iii) | $1,000,000.00 |
| | Subtotal, Trigger Amount | $8,101,891.48 |
| | Net proceeds less trigger amount | = $1,646,922.77 |
| | × ½ (Plaintiffs' share) = | $ 823,461.38 |